No. 13-3597

_____

# UNITED STATES COURT OF APPEALS

# FOR THE SIXTH CIRCUIT

_____

MARK D. LEE, Plaintiff-Appellant

v.

SMITH & WESSON CORP., Defendant-Appellee

_____

On Appeal from the United States District Court
For the Northern District of Ohio
No. 1:11-CV-01940 (Honorable Daniel A. Polster)

_____

# BRIEF OF APPELLEE

_____

Clem C. Trischler, Esquire
PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
(412) 263-2000
Fax: (412) 263-2001
Email: cct@pietragallo.com

*Attorneys for Defendants–Appellees*
SMITH & WESSON CORPORATION

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 26.1, Smith & Wesson Corporation states that it is a wholly owned subsidiary of Smith & Wesson Holding Corporation. Smith & Wesson Holding Corporation is a publicly traded corporation listed under the symbol "SWHC". There are no other publicly held corporations or entities that have a direct financial interest in the above-captioned litigation with regard to Smith & Wesson.

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ........................................... *i*

TABLE OF CONTENTS ............................................................... *ii*

TABLE OF AUTHORITIES ......................................................... *iii*

STATEMENT OF JURISDICTION .................................................... 1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ................. 2

STATEMENT OF THE CASE ........................................................ 3

STATEMENT OF THE FACTS ....................................................... 7

SUMMARY OF THE ARGUMENT .................................................. 15

STANDARD OF REVIEW ........................................................... 17

ARGUMENT ........................................................................... 19

     I.     Ruel's Testimony Is Irrelevant And Inadmissible
           Because It Directly Contradicts Lee's Sworn
           Testimony And Is Based On An Accident
           Scenario Divorced From Reality ............................. 19

     II.    The Cases Cited By Appellant Do Not Justify Or
           Support Reversal Of The District Court's Order ................... 27

CONCLUSION ........................................................................ 33

RELIEF REQUESTED ................................................................ 34

CERTIFICATE OF COMPLIANCE ................................................. 35

DESIGNATION OF RELEVANT COURT DOCUMENTS ..................... 36

CERTIFICATE OF SERVICE ....................................................... 37

ADDENDUM

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

<u>**Page(s)**</u>

Andler v. Clear Channel Broad, Inc.,
     670 F.3d 717 (6th Cir. 2012) ............................................................... 27, 28

Bogosian v. Mercedes-Benz,
     104 F.3d 472 (1st Cir. 1997)................................................................ 19

Clark v. Taketa Corp., 192 F.3d 750 (7th Cir. 1999).................................... 26

Daubert v. Merrell Dow Pharmaceutical, Inc.,
     509 U.S. 579, 113 S. Ct. 2786 (1993) ............................................... *passim*

Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000) .................................. 20

General Electric Co. v. Joiner, 522 U.S. 136,
     118 S. Ct. 512 (1997).......................................................................... *passim*

Greenwell v. Boatwright, 184 F.3d 492 (6th Cir. 1999)............................... 15, 17

J.B. Hunt Transport, Inc. v. General Motors Corp.,
     243 F.3d 441 (8th Cir. 2001) ............................................................. 26

Kumho Tire Co. v. Carmichael, 526 U.S. 137,
     119 S. Ct. 1167 (1999)....................................................................... *passim*

Lava Trading, Inc. v. Hartford Fire Ins. Co.,
     No. 03 Civ. 7037(PKC), 2005 WL 4684238
     (S.D.N.Y. April 11, 2005) ................................................................. 20

Mohney v. USA Hockey, Inc.,
     138 Fed. Appx. 804 (6th Cir. 1993)..................................................... 25

**Page(s)**

Morales v. Am. Honda Motor Co.,
    151 F.3d 500 (6th Cir. 1998) ................................................................ 27, 28

Muktar v. California State Univ., Hayward,
    299 F.3d 1053 (9th Cir. 2002) ................................................................ 29

Pittman v. ANR Freight Sys., Inc.,
    47 Fed. Appx. 266 (6th Cir. 2002)........................................................ 17

Pomella v. Regency Coach Lines, Inc.,
    899 F. Supp. 335 (E.D. Mich. 1995) ................................................... 19

Soldo v. Sandoz Pharm. Corp.,
    244 F. Supp.2d 434 (W.D. Pa. 2003) ................................................... 20

Sutkiewicz v. Monroe County Sheriff,
    110 F.3d 352 (6th Cir. 1997) ............................................................... 18

United States v. Bonds, 12 F.3d 540 (6th Cir. 1993).................................. 25

United States v. Williams, 952 F.2d 1504 (6th Cir. 1991) ......................... 15, 18

**Rules**

Fed. R. Evid. 401(a).................................................................................... 32

Fed. R. Evid. 702 ........................................................................................ *passim*

**Statutes**

28 U.S.C. 1291 ............................................................................................ 1

28 U.S.C. 1332 ............................................................................................ 1

iv

## STATEMENT OF JURISDICTION

The United States District Court for the Northern District of Ohio had diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as Defendants–Appellees Smith & Wesson, Corp. ("Smith & Wesson") removed this action on September 14, 2011, from the Court of Common Pleas for the County of Cuyahoga, State of Ohio. (See RE 1, Notice of Removal, ¶¶ 1–20, Page ID #1–5.) As alleged in the Notice of Removal, complete diversity exists among Smith & Wesson and Plaintiff–Appellant Mark D. Lee, ("Lee"), and the matter in controversy exceeds $75,000, exclusive of interest and costs. (Id.) See also, 28 U.S.C. § 1332(a)(1).

The United States District Court for the Northern District of Ohio granted Smith & Wesson's Motion to Preclude the Testimony of Roy Ruel on January 23, 2013. (See RE 52, Memorandum of Opinion and Order, Page ID #1369-1373.) A Joint Stipulation and Agreement of Dismissal with Prejudice was subsequently filed on April 18, 2013. (See RE 55, Stipulated Motion to Dismiss, Page ID #1378.) Plaintiff filed a Notice of Appeal on May 9, 2013. (See RE 57, Notice of Appeal, Page ID #1382.) Plaintiff cites to 28 U.S.C.A. § 1291 in support of this Court's jurisdiction over his appeal. (See USCA, Document No. 006111812898, Brief of Appellant, at 6.)

1

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the District Court Properly Exercised its Gatekeeping Responsibility When it Precluded Expert Testimony that Contradicted Sworn Testimony and Did Not Fit the Facts of this Case.

## STATEMENT OF THE CASE

Having worked through four (4) sets of lawyers, two (2) different experts with conflicting theories, and at least three (3) different courts, this appeal represents the latest in a series of efforts by Mr. Lee to pin blame on Smith & Wesson for injuries he sustained in a firearms-related accident on November 11, 2006.  (See RE 5-1, Smith and Wesson's Memorandum of Law in Support of its Motion for Costs, Page ID #90-91.)  Try as he might, however, Lee simply cannot place fault at the feet of Smith & Wesson because there is no competent, reliable expert testimony that establishes the existence of a defect in the 460 XVR revolver. The district court recognized this fact, and the dismissal of this action followed the entry of an Order precluding plaintiff from attempting to create a case built on speculative testimony that was divorced from critical facts.  (See RE 52, Memorandum of Opinion and Order, Page ID #1373.)  In doing so, the district court properly exercised its gatekeeping responsibility, and the judgment of the district court should not be disturbed on appeal.

The long and tortured path that brings the parties to the Sixth Circuit Court of Appeals actually began in the Court of Common Pleas of Richland County, Ohio, on November 4, 2008 (i.e., the "first state court action").  (See RE 5-1, Smith and Wesson's Memorandum of Law in Support of its Motion for Costs, Page ID #90.)  In the first state court action, Lee alleged that his injuries were

caused by an alleged deficiency in the design of the 460 XVR, and he retained Richard Ernest to substantiate this claim.  (Id.)  Ernest took the position that the cylinder of the revolver was closed at the time Lee pulled the trigger.  (See RE 4-4, Smith & Wesson's Motion to Strike and Motion to Preclude the Testimony of Richard Ernest, Page ID #78.)  However, due to a supposed deficiency in the design of the cylinder-retaining screw, Ernest suggested that the cylinder opened on discharge, allowing excess gas to escape under pressure.  (Id., Page ID #75.)

In what would prove to be a trend, Ernest's theory was soon exposed as baseless.  The function of the cylinder-retaining screw was to prevent the cylinder from falling out of the frame during loading.  (See RE 37-1 Report of Smith & Wesson's Expert James C. Hutton, Page ID #628.)  It has no role in holding the cylinder in place during firing.  (Id.)  Once Smith & Wesson demonstrated this undeniable fact through testing, Lee quickly jettisoned Ernest; discharged his first set of lawyers; and voluntarily dismissed, without prejudice, the first state court action.  (See RE 5-1, Smith and Wesson's Memorandum of Law in Support of its Motion for Costs, Page ID #90-91.)

Lee then re-filed this case in the Court of Common Pleas of Cuyahoga County, Ohio, and Smith & Wesson timely removed the matter to the United States District Court for the Northern District of Ohio (i.e., the "federal court action"). (See RE 1, Smith & Wesson Notice of Removal, Page ID #1.)  Done with Mr.

Ernest, Lee attempted to obtain a second bite of the apple through the testimony of Roy Ruel, P.E., who offered a theory of the accident that was 180 degrees removed from that which the plaintiff pursued in the first state court action. (See RE 11, Smith & Wesson Reply Brief in Support of its Motion for Costs, Page ID #369.) In Ruel's world, the cylinder was not closed at the time Lee pulled the trigger; it was actually open! (See RE 46-11, Report of Roy Ruel, Page ID #1108.) According to Ruel, Mark Lee then attempted to fire the revolver, but he could not pull the trigger. (Id.) If the cylinder were open, this is not surprising since the 460 XVR is designed with a safety feature that prevents firing when the cylinder is open. (See RE 46-4, Deposition Transcript of Roy Ruel, Page ID #746.) Apparently frustrated that he could not pull the trigger, Ruel goes on to suggest that Lee then deliberately manipulated the thumb piece to defeat the safety features of the firearm. (See RE 46-3, Deposition Transcript of Roy Ruel, Page ID #727.) That is, while holding the thumb piece rearward to trick the mechanism into believing that the cylinder was closed, Ruel suggests that Lee simultaneously pulled the trigger. (See RE 46-11, Report of Roy Ruel, Page ID #1108.)

There is one major problem with Ruel's new theory—it does not fit the facts of this case. Not only does the theory fail to fit the facts of the case, Ruel's opinion is contradicted by Mark Lee's sworn testimony. (See RE 52, Memorandum of Opinion and Order, Page ID #1371-72.) There are absolutely no

facts to establish that the cylinder was open prior to firing. Contrary to Ruel's suggestion, there is absolutely no evidence that Lee was unable to pull the trigger. There is nothing in the record establishing that Lee manipulated the thumb piece to defeat the firearm's safety features. Ruel has literally pulled the facts from thin air. With the record painfully clear that plaintiff's new theory of liability was one divorced from the facts, Smith & Wesson filed a motion to preclude seeking to bar Ruel's testimony on the basis that it failed to meet the relevancy prong of Rule 702 of the Federal Rules of Evidence. (See RE 46, Smith & Wesson Motion in Limine to Preclude Testimony of Roy Ruel, ¶¶1-4, Page ID #672-73.) The district court agreed, noting that Ruel offers an opinion that contradicts Lee's sworn testimony. (See RE 52, Memorandum of Opinion and Order, Page ID #1373.) Such an opinion does not satisfy the relevancy requirement under Rule 702, for it is an opinion that "does not fit the facts of the case." (Id.) Without any competent or credible expert testimony to support a defect theory, a Joint Stipulation and Agreement of Dismissal with Prejudice was filed on April 18, 2013. (See RE 55, Stipulated Motion to Dismiss, Page ID #1378.) This appeal followed on May 9, 2013. (See RE 57, Notice of Appeal, Page ID #1382.)

## STATEMENT OF THE FACTS

This appeal focuses on the opinion testimony of Roy Ruel and whether Ruel's opinions meet the standards for admissibility established under Rule 702 of the Federal Rules of Evidence. The district court found a clear flaw or gap in Ruel's analysis—it was not based on the facts in evidence. (See RE 52, Memorandum of Opinion and Order, Page ID #1373.) Because Lee is pushing a liability theory that does not fit the facts of this case, the district court did not abuse its discretion in precluding Ruel's testimony.

To understand the numerous flaws and inconsistencies in Ruel's theory, it is helpful to understand the function of this revolver and the known circumstances surrounding the November 11, 2006 incident. The 460 XVR is a high-powered, high-velocity revolver designed for use by individuals interested in large game handgun hunting. (See RE 46-1, Smith & Wesson's Brief in Support of its Motion in Limine to Preclude Testimony of Roy Ruel, Page ID #681.) By definition, the revolver has a five (5) round rotating cylinder, and it is designed to accommodate .460 S&W Magnum-caliber ammunition. (Id.) The revolver is capable of being fired in both single-action and double-action mode. (Id.) When operating in single-action mode, the user cocks the hammer, locking it in the "ready to fire" position. (Id.) The act of pulling the trigger then causes the hammer to fall, allowing the firing pin to strike the cartridge primer and detonate the chambered

round.  (Id.)  Double-action firing refers to the situation where the act of pulling the trigger performs two (2) functions:  It cocks the hammer and fires the round when the hammer is released.  (Id.)  What follows is a photograph of a typical revolver and which identifies the key features of the firearm, including those features found on the 460 XVR:



FIGURE 4

(Id., Page ID #682.)

While target shooting on November 11, 2006, Mark Lee testified that he operated the 460 XVR exclusively in the single-action mode.  (See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1036.)  He fired three (3) rounds from the revolver, each time placing a single round in the cylinder.  (Id., Page ID #1028-29, 1035-36.)  When the hammer is cocked for single-action firing, the cylinder rotates in a counter-clockwise direction.  (See RE 46-4, Deposition

Transcript of Roy Ruel, Page ID #746.)  What this means is that Mr. Lee had to place each round in the charge hole to the right of the center of the chamber and barrel (as you look at the revolver from the rear end) in order to ensure that the ammunition would align with the firing pin and barrel.

Notably, Lee testified that, up until the time of the accident, he had no difficulty operating the firearm.  (See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1029, 1034-36.)  To load each round, Lee had to open the cylinder by pushing the thumb piece forward.  (Id., Page ID #1004-05.)  He then closed the cylinder by pushing the cylinder into the frame until it locked in place.  (Id., Page ID #1028-29.)  Under normal use, the hammer of the 460 CVR can be cocked and the trigger pulled only when the cylinder is closed and locked in position.  (See RE 46-4, Deposition Transcript of Roy Ruel, Page ID #746.)  That is, with the cylinder open, the firing mechanism is disengaged such that it is impossible, in normal use, to cock the hammer or pull the trigger.  (Id.)  In this case, the testimony from Mark Lee is clear—he loaded a single round into the cylinder; closed the cylinder; and then fired the revolver in single-action mode by cocking the hammer and pulling the trigger.  (See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1028-29, 1036-37.)  He repeated this process three (3) times until, on firing third round, he felt as if, "somebody hit [him] with a sledgehammer in the face . . . ."  (Id., Page ID #1035-36.)

Lee's account of this accident makes it clear that he closed the cylinder each and every time before firing.  This testimony on this point is crystal clear:

Q:    Were you able to close the cylinder?

A:    When I re-chambered the third round, yes.

Q:    And obviously the first two rounds or else you couldn't have fired it?

A:    Correct.

Q:    So it opened and closed normally?

A:    Yes.

Q:    And fired just as it had every other time you fired the gun?

A:    Yes

(Id., Page ID #1034-35.)

Ignoring Lee's sworn testimony and fishing for an explanation that might arguably support a twisted defect theory, Roy Ruel has created an alternative explanation for what occurred on November 11, 2006.  Unfortunately for Mr. Lee, Ruel's theory is just that—a theory with no basis in fact that disregards sworn testimony.  Because there is no basis in fact for his opinion, the testimony fails a fit requirement of Rule 702 and was properly barred by the district court.

### AN OVERVIEW OF RUEL'S BASELESS THEORY

There is one thing that all of the parties agree upon—the revolver should not be fired with the cylinder open.  In fact, Smith & Wesson designs all of its

10

revolvers that possess an exposed hammer, including the 460 XVR, with a hammer-stop feature that prevents cocking of the hammer or pulling the trigger when the cylinder is open.  (See RE 46-4, Deposition Transcript of Roy Ruel, Page ID #746.)  In this case, Ruel has suggested that the hammer-stop feature can be defeated through intentional and deliberate manipulation of the thumb piece.  (Id., Page ID #727.)

To open the cylinder, the thumb piece is moved forward toward the muzzle end of the barrel and late pressure is applied to the back side of the cylinder.  (Id., Page ID #746.)  When the cylinder is then closed, the thumb piece will revert to a rearward position toward the grip.  (Id.)  With the cylinder closed and the thumb piece position rearward, the hammer stop is forced out of the way, allowing the trigger to be pulled.  (Id., Page ID #745.)

Here, Ruel has suggested that Smith & Wesson's hammer-stop feature is not fool-proof in that it can be defeated and a gun made to fire with the cylinder open. (See RE 46-11, Report of Roy Ruel, Page ID #1109.)  To defeat this safety feature, Ruel suggests that Mr. Lee engaged in the following series of unlikely maneuvers:

1. While loading a round into one of the cylinder charge holes, Lee failed to close the cylinder.

2. The cylinder opened, Lee pulled the trigger and tried to fire the gun.  He could not do so.

3. With the cylinder open, Lee then pushed the thumb piece rearward in order to trick the mechanism into believing that the cylinder was in a closed position.

4. While simultaneously holding the thumb piece rearward, Lee then cocked the hammer and pulled the trigger.

(Id., Page ID #1108.)

Essentially, through such a series of maneuvers, Ruel suggests that the hammer-stop feature can be tricked into believing that the cylinder is closed, and that the firearm can be made to fire in a manner other than intended. (See, id.) If Ruel's theory were true, he has suggested that Lee defeated a safety feature through misuse and deliberate manipulation of the thumb piece. Setting aside that his theory supports a mishandling and misuse defense, rather than a product defect claim, Ruel's analysis is fundamentally flawed because it simply lacks support in the record. Stated another way, there is no evidence suggesting that Ruel's reconstruction scenario occurred. Recognizing that the admissibility of opinion evidence requires that the expert's analysis fit the facts of a given case, Smith & Wesson filed a Motion to Preclude Ruel's testimony, arguing that the scenario Ruel outlined is one lacking factual support in the record. (See RE 46, Smith & Wesson Motion in Limine to Preclude Testimony of Roy Ruel, ¶¶1-4, Page ID #672-73.)

Ruel's baseless analysis starts with the claim that the cylinder was open. (See RE 46-11, Report of Roy Ruel, Page ID #1108.) Lee testified that it was

12

closed.  (See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1034.)
Speculating that the cylinder was open, Ruel goes on to hypothesize that Lee tried
to pull the trigger but could not.  (See RE 46-11, Report of Roy Ruel, Page ID
#1108.)  Lee emphatically denies this.  (See RE 46-9, Deposition Transcript of
Mark Lee, Page ID #1035-36.)  Because he could not pull the trigger, Ruel goes on
to suggest that Lee intentionally manipulated the thumb piece so as to defeat the
hammer-stop.  (See RE 46-3, Deposition Transcript of Roy Ruel, Page ID #727.)
There is absolutely no evidence that such a scenario occurred.  In fact, Lee
demonstrated his use of the revolver during his sworn deposition, and it is
abundantly clear from his demonstration that he was not manipulating the thumb
piece as he fired the revolver:



(See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1036-37.)

Recognizing that a picture is worth a thousand words, Lee's demonstration
confirms beyond doubt that he never touched the thumb piece, nor was he trying to
pull it rearward during the firing sequence as Ruel suggests.  Simply put, Ruel's

theory of product defect is dependent on an accident scenario pulled from thin air; he ignores the sworn testimony of the plaintiff and his opinion testimony has no basis in fact.

When confronted with these issues, the district court exercised its responsibility as a gatekeeper and conducted a thorough review of the record. After extensive review of the record, the district court recognized the fatal flaws in Ruel's analysis, noting:

> Lee testified he had no difficulty whatsoever firing the gun a third time. He even denied what Ruel speculates he did: tried but failed, to pull the trigger. In fact, Lee said everything was exactly the same as when he fired the first two shots. Lee also testified, contrary to Ruel's theory, that the cylinder was closed when he fired the third round. In addition, Lee's demonstration, as depicted in the photograph included in defendant's brief, makes clear that he never touched he [sic] thumb piece during the firing sequence, as Ruel speculates he did.

(See RE 52, Memorandum of Opinion and Order, Page ID #1372.)

Confronted with relevant expert testimony divorced from the facts, the district court followed the mandates of Rule 702 and barred the testimony of Roy Ruel. (Id., Page ID #1373.) It is submitted that the decision was a proper exercise of the district court's discretion.

## SUMMARY OF THE ARGUMENT

"A court of appeals is to apply an abuse-of-discretion standard when it 'review[s] a trial court's decision to admit or exclude expert testimony.'" Kumho Tire Co., v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  See also, General Electric Co. v. Joiner, 522 U.S. 136, 138-39, 118 S. Ct. 512, 515 (1997); Greenwell v. Boatwright, 184 F.3d 492, 495 (6th Cir.1999). "A finding of abuse of discretion will be made only where the reviewing court is firmly convinced that a mistake has been made." United States v. Williams, 952 F.2d 1504, 1518 (6th Cir.1991).

In this case, Ruel offered a speculative theory of the accident that is dependent on the following series of events:

1.    Lee tried, but was unable to fire the revolver.

2.    Lee was unable to fire the revolver because the cylinder was open.

3.    In order to get the revolver to fire in this abnormal configuration, Lee then manipulated the thumb piece by holding in rearward, i.e., the cylinder closed position.

4.    In an effort to get the gun to fire with the cylinder open, Lee then simultaneously cocked the hammer and pulled the trigger as he held the thumb piece rearward.

(See RE 46-11, Report of Roy Ruel, Page ID #1108.)

There was no mistake in precluding such speculative testimony.  As the district court correctly observed, Ruel's testimony is irrelevant and inadmissible

15

because his theory is contradicted by sworn testimony. (<u>See</u> RE 52, Memorandum of Opinion and Order, Page ID #1373.) The district court's Order was in keeping with a long line of federal precedents which have routinely excluded expert testimony that contradicts or disregards the facts of record.

The district court's decision to exclude Ruel's testimony was not an abuse of discretion because his factual foundation does not meet the fit requirement of Rule 702 of the Federal Rules of Evidence. Acting in its capacity as the gatekeeper responsible for ensuring that only reliable and relevant evidence is admitted, the district court looked at the totality of the events and found that plaintiff was attempting to move forward on opinion evidence that was not just weak, but was predicated on a chain of events that never occurred. Opinion testimony that is divorced from the fact of the case is not helpful to the trier of fact and falls woefully short of satisfying the requirements of Rule 702. This Honorable Court should not now substitute its judgment or that of the district court, and judgment in favor of Smith & Wesson should be affirmed.

## STANDARD OF REVIEW

"A court of appeals is to apply an abuse-of-discretion standard when it 'review[s] a trial court's decision to admit or exclude expert testimony.'" Kumho, 526 U.S. at 152, 119 S. Ct. at 1176. See also General Electric Co., 522 U.S. at 138-39, 118 S. Ct. at 515; Greenwell, 184 F.3d at 495. In Daubert v. Merrell Dow Pharmaceutical, Inc., the Supreme Court determined that a trial judge serves as a "gate keeper" in order to determine whether expert testimony is admissible. Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993). The court specifically withheld issuing any sort of checklist for judges to use, recognizing that it could not anticipate all situations or witnesses or future changes in science and technology that may need expert explanation. Pittman v. ANR Freight Sys., Inc., 47 Fed. Appx. 266, 269 (6th Cir. 2002), citing Daubert, 590 U.S. at 593, 113 S. Ct. at 2796. The trial court is granted considerable leeway and flexibility in determining whether particular expert testimony is relevant and reliable. Kumho, 526 U.S. at 152-53, 119 S. Ct. at 1176.

The requirements of Daubert and its progeny were later codified in Rule 702 of the Federal Rules of Evidence which mandates that a witness seeking to offer scientific, technical, or other specialized testimony must meet three (3) requirements: (1) the witness is qualified by knowledge, skill, experience, training, or education; (2) the testimony is relevant; and, (3) the testimony is reliable. Here,

the district court found the testimony irrelevant and a "finding of abuse of discretion will be made only where the reviewing court is firmly convinced that a mistake has been made." United States v. Williams, 952 F.2d 1504, 1518 (6th Cir.1991). In addition, "[t]he discretion of the trial court is not to be disturbed on appeal unless ... the ruling excluding the evidence is not only erroneous but results in substantial injustice to the aggrieved party." Sutkiewicz v. Monroe County Sheriff, 110 F.3d 352, 357 (6th Cir.1997). On appeal, this court is obligated to take cognizance of the fact that deference to the trial court's decision is the "hallmark" of abuse of discretion review. General Electric Co., 522 U.S. at 143, 118 S. Ct. at 517.

## ARGUMENT

The decision of the District Court to preclude the testimony of Roy Ruel should be affirmed because his opinion testimony fails the reliability requirement of Rule 702 of the Federal Rules of Evidence.

### I.    Ruel's Testimony is Irrelevant and Inadmissible Because it Directly Contradicts Lee's Sworn Testimony and is Based on an Accident Scenario Divorced From Reality.

The trial court correctly excluded the opinion of Ruel as irrelevant and inadmissible because it contradicted Lee's sworn testimony.    (See RE 52, Memorandum of Opinion and Order, Page ID #1373.)

Courts have routinely held that expert testimony which contradicts the facts is irrelevant and inadmissible.  See, e.g., Pomella v. Regency Coach Lines, Inc., 899 F. Supp. 335 (E.D. Mich. 1995) (excluding expert testimony that failed Daubert's fit requirement because a crucial factual assumption underlying the expert's accident reconstruction was belied by the record facts), Bogosian v. Mercedes-Benz, 104 F.3d 472, 479 (1st Cir. 1997) (finding that the testimony of Appellant's automotive design expert failed to satisfy Daubert's relevance requirement because the factual assumptions underlying his defect theory contradicted the Appellant's sworn testimony; in so doing, the Circuit Court of Appeals noted that "[t]he district court appropriately found it very odd that [Appellant] would present an expert witness who would testify that her own

19

unwavering testimony was incorrect."), <u>Lava Trading, Inc. v. Hartford Fire Ins. Co.</u>, No. 03 Civ. 7037(PKC), 2005 WL 4684238, at 20-21 (S.D.N.Y. April 11, 2005) (finding that the testimony of Appellant's damages expert failed <u>Daubert</u>'s fit requirement because crucial factual assumptions underlying his theory were belied by the record facts), <u>Soldo v. Sandoz Pharm. Corp.</u>, 244 F.Supp.2d 434, 562-65 (W.D. Pa. 2003) (concluding that the testimony of Appellants' medical causation experts failed to fit the facts of the case because their opinions were "based on false assumptions and fictional or random data"), and <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 754-56 (3d Cir. 2000) (finding that the trial court abused its discretion in admitting the testimony of Appellant's damages expert because it was based on factual assumptions that were contradicted by the record facts).

Ruel's theory is similarly based on a scenario that has no factual support. It starts with the baseless claim that the cylinder was open. (<u>See</u> RE 46-11, Report of Roy Ruel, Page ID #1108.) However, Lee testified as follows:

Q:    Were you able to close the cylinder?

A:    When I rechambered the third round, yes.

(<u>See</u> RE: 46-9, Deposition Transcript of Mark Lee, Page ID #1034.) Speculating that the cylinder was open, Ruel goes on to hypothesize that Lee tried to pull the trigger but could not. (<u>See</u> RE 46-11, Report of Roy Ruel, Page ID #1108.) However, Lee emphatically denied this:

Q:    Tell me what happened when you took the line the third time?

A:    I went up to the line, chambered the round, closed the gun, sighted down on the target and … shot . . . .

(See RE: 46-9, Deposition Transcript of Mark Lee, Page ID #1035-36.) Continuing to ignore Lee's testimony, Ruel goes on to suggest that because Lee could not pull the trigger, he intentionally pulled back on the thumb piece so as to defeat the hammer stop.  (See RE: 46-3, Deposition Transcript of Roy Ruel, Page ID #727.)  There is absolutely no evidence that such a scenario occurred.  To the contrary, at deposition, Lee demonstrated how he was holding the gun immediately before the accident.  Lee's demonstration shows that both of his thumbs were around the grip when he pulled the trigger and fired.  (See RE: 46-9, Deposition Transcript of Mark Lee, Page ID #1036-37.)  To put it simply, Ruel has created an accident scenario that directly contradicts Lee's testimony as to how this accident occurred.

In fact, Ruel himself admitted that several crucial factual assumptions underlying his reconstruction scenario fail to correspond with the facts as testified to under oath by Lee.  Specifically, Ruel admitted:

Q:    You're not accepting [Mr. Lee's] sworn testimony as part of your analysis of this case?

A:    That's correct.

Q:    Because you would agree that his account of the events of 11/11/06 is different from your reconstruction?

21

A:    It also – yeah.  It agrees with an account that the cylinder was open after the event.

\* \* \*

Q:    [Your] reconstruction of the events is inconsistent with Mr. Lee's testimony as to what happened on November 11, 2006?

A:    As reflected in this, yes.

Q:    When you say "as reflected in this," you are talking about his deposition?

A:    Yes, I'm talking about his deposition as of that date.

(See RE 46-4, Deposition Transcript of Roy Ruel, Page ID #754.)

Ruel essentially sought to offer an opinion that Lee's sworn testimony was incorrect.  However, not only is Ruel's testimony inconsistent with the Appellant's version of the events; it also has no factual support in the record. Under these circumstances, it does not fit the facts of this case and fails to satisfy the requirements of Daubert.  See, Daubert, 509 U.S. at 591, 113 S. Ct. at 2796 (as a precondition to admissibility, "expert testimony [must be] sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute") (citation and punctuation omitted). Accordingly, the district court correctly precluded the testimony of Ruel and certainly did not abuse its discretion in so doing.

22

In what can, at best, be characterized as a gross understatement, Lee argues that there is nothing but an "***alleged mismatch***" between his testimony and Ruel's theory of the case.  Moreover, he conveniently labels the "***alleged mismatch***" as "insignificant."  (See USCA, Document No. 006111812898, Brief of Appellant, at 17.)  In reality, there is no alleged mismatch between the sworn testimony and Ruel's speculative theory.  The "mismatch" is real and irreconcilable.  Ruel's theory of defect and causation is dependent upon a chain reaction series of events that simply never occurred.  This is undeniably established in the following chart which illustrates Ruel's speculative theory is belied by the record facts:

| FACT # | RUEL'S SUPPOSED FACTS | RECORD FACTS |
|---|---|---|
| 1. | Immediately before the accident on November 11, 2006, as he prepared to fire the revolver a third time, **Lee tried to close the cylinder but was unable to do so**.<br><br>(See RE 46-11, Report of Roy Ruel, Page ID #1108.) ("[w]hen Mr. Lee attempted to fire his gun for the third shot, the cylinder failed to fully close . . . ."). | **Lee closed the cylinder without difficulty** – just as he had done the prior fifteen times he'd fired the revolver, including twice before on the accident date:<br><br>Q:    Were you able to close the cylinder?<br><br>A:    When I rechambered the third round, yes.<br><br>(See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1034.) |

| FACT # | RUEL'S SUPPOSED FACTS | RECORD FACTS |
|--------|----------------------|--------------|
| 2. | Because the cylinder was not fully closed, **when Lee tried to cock the hammer and pull the trigger, he was unable to do so**.<br><br>(See RE 46-4, Deposition Transcript of Roy Ruel, Page ID #753.) ("[Lee] attempted to cock the gun and it wouldn't cock because the cylinder wasn't closed."). | **Lee cocked the hammer and fired with no difficulties**. Thus, contrary to Ruel's reconstruction, Lee never testified that he was unable to cock the hammer:<br><br>Q:    Tell me what happened when you took the line the third time?<br><br>A:    I went up to the line, chambered the round, closed the gun, sighted down on the target and … shot . . . .<br><br>(See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1035-36.) |
| 3. | **Lee deliberately defeated the hammer stop mechanism by pulling the thumb latch back into the closed position. Simultaneously, he pulled back on the hammer and fired**:<br><br>Q:    To create the condition which you identified, what you need to do is to deliberately hold the thumb piece rearward while cocking the hammer?<br><br>A:  You have to push it to the rear and cock the hammer simultaneously.  That is true.<br><br>(See RE 46, Smith & Wesson Motion in Limine to Preclude Testimony of Roy Ruel, Attachment 3, Page ID #727.) | **There is absolutely no testimony from Lee that he held the thumb piece *back* while simultaneously cocking the hammer, and then pulled the trigger.  In fact, there is no testimony from Lee that he ever pulled back on the thumb latch – period**.    To the contrary, at deposition, Mr. Lee demonstrated how he was holding the gun immediately before the accident. Lee's demonstration shows that both of his thumbs were resting on the revolver's frame when he pulled the trigger and fired.<br><br>(See RE 46-9, Deposition Transcript of Mark Lee, Page ID #1036-37.) |

In short, the theory that is not tied to the facts and fails the fit requirement announced in <u>Daubert</u> and its progeny.  This court explained the relevance or fit requirement as follows:

> Under [the] liberal federal rules, the trial judge must ensure that scientific testimony is 'not only relevant but reliable.'  The 'relevance' requirement stems from Rule 702's requirement that the testimony 'assists the trier of fact to understand the evidence or to determine a fact in issue.'  Thus, there must be a 'fit' between the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the case is not relevant and therefore not helpful.

<u>United States v. Bonds</u>, 12 F.3d 540, 554 (6th Cir. 1993) (citations omitted).  This relevancy or fit requirement has been characterized as a "critical one":

> Nothing either in <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

<u>See</u> <u>Mohney v. USA Hockey, Inc.</u>, 138 Fed. Appx. 804, 809 (6th Cir. 2005), citing <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed.2d 508 (1997).  This is a classic example of a liability theory tied to the facts of the case by nothing more than the *ipse dixit* of the expert.  Only Roy Ruel claims that the cylinder was open on firing.  Mark Lee has testified to the contrary.  Only Roy Ruel claims that Lee attempted to fire the revolver by pulling the trigger but was unable to do so.  Only Roy Ruel claims that the thumb piece was held rearward to

allow the revolver to fire in a "chamber open" configuration when the demonstrative evidence shows otherwise. The objective of <u>Daubert's</u> gatekeeping requirement is to keep out subjective belief and unsupported speculation. <u>See Clark v. Takata Corp</u>., 192 F.3d 750, 757 (7th Cir. 1999). In a case like this, when the expert has pulled facts from thin air to create a liability theory, the district court properly exercised its discretion to keep out such utter speculation.

Decisions from other federal courts illustrate that the district court did not abuse its discretion in this instance when it refused to permit an expert to offer a theory of liability contradicted by the facts. For instance, in <u>J.B. Hunt Transport, Inc. v. General Motors Corp</u>., 243 F.3d 441 (8th Cir. 2001), the plaintiff was pursuing a contribution claim against General Motors Corporation following a multi-vehicle collision. To support a seatback failure claim, plaintiff sought to introduce the testimony of an accident reconstructionist who planned to opine that there were only three (3) impacts during the accident sequence. However, this "three-impact theory" was contradicted by eyewitness testimony. Finding that an accident reconstruction which contradicted undisputed eyewitness testimony was speculative, the district court refused to permit the testimony. On appeal, the Eighth Circuit Court of Appeals affirmed, noting that expert opinion testimony that ignores undisputed factual accounts of the accident was nothing more than "mere speculation and conjecture." <u>J.B. Hunt Transport, Inc</u>., 243 F.3d at 444. Here, and

notwithstanding Lee's disingenuous efforts to label the differences between Ruel's theory and the sworn testimony as "insignificant," the reality is that Ruel was offering a theory of the accident that contradicted sworn testimony. Under the circumstances, the district court found that such an opinion amounted to mere speculation and conjecture. Given that deference to the district court is the hallmark of abuse of discretion review, it is respectfully submitted that the district court's decision should not be disturbed on appeal.

## II.    The Cases Cited by Appellant Do Not Justify or Support Reversal of the District Court's Order.

Acknowledging the lack of factual foundation for Ruel's opinion, Lee attempts to persuade this court that a weak factual basis is no reason to preclude an expert opinion. Lee goes on to claim that the weakness of the factual predicate is a matter that goes to weight, not admissibility. In support of this claim, Lee relies upon two cases, Andler v. Clear Channel Broad, Inc., 670 F.3d 717 (6th Cir. 2012) and Morales v. Am. Honda Motor Co., 151 F.3d 500 (6th Cir. 1998), both of which are distinguishable and neither of which support Lee's proposition. In Andler v. Clear Channel Broad, Inc., this court found the district court had abused its discretion in precluding the testimony of plaintiff's expert pertaining to loss of earning capacity. This court concluded that all analysis of future damages involved a degree of speculation, but not unrealistic speculation. Thus, the weakness of using pre-injury earning capacity as a factual basis for the expert's

testimony was not reason for the court to exclude the expert's testimony. Moreover, in <u>Andler</u>, the court found a factual basis, albeit a potentially weak one, for the earning capacity projection. The plaintiff in <u>Andler</u> planned to return to work after her children completed elementary school and the projections were based on Bureau of Labor Statistics figures. <u>Andler</u>, 607 F.3d at 728-79.

In stark comparison, Ruel's factual basis in not just weak, it is fictional! By his own admission, the basis for his opinion ignores Lee's testimony of what actually happened. Analysis of future damages may be admissible despite its inherent speculative nature, but Ruel's opinion drastically differs from <u>Andler</u> as his testimony flies directly in the face of Lee's testimony. Therefore, Appellant errantly relies upon <u>Andler</u> for the proposition that an expert's testimony need not be based on the facts.

<u>Morales v. Am. Honda Motor Co.</u>, <u>supra</u>, fails to support Appellant's argument as well. In <u>Morales</u>, the defendants unsuccessfully challenged the admission of plaintiff's expert due to his lack of qualifications. However, this court allowed the expert to testify because defense counsel had the opportunity to cross examine him on his qualifications in front of the jury. This gave the jury an opportunity to give the expert's testimony as much credence as it deserved. In short, the issue in <u>Morales</u> did not focus at all on the relevancy prong of Rule 702, and the opinion is of little value here.

Despite Lee's recitation of Ruel's background, his qualifications are not at issue in this appeal and any argument propounding them is completely irrelevant.[1] Further, it is not within the purview of a lay jury to determine if proposed expert testimony is relevant and reliable. Granting a lay jury with this responsibility would completely undercut the purpose of instilling the gatekeeping duties with the trial court. As enunciated in <u>Daubert</u> trial judges have the role of "gatekeeper" to ensure "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." <u>Id.</u>, 113 S. Ct. at 2795. Ruel's is neither.

Following Lee's line of reasoning would completely strip trial courts of their gatekeeping responsibilities and contradict the intent set forth in <u>Daubert</u>. "The trial court's "special obligation" to determine the relevance and reliability of an expert's testimony, <u>Kumho</u>, 526 U.S. at 147, 119 S. Ct. at 1174, is vital to ensure accurate and unbiased decision-making by the trier of fact" <u>Mukhtar v. California State Univ., Hayward</u>, 299 F.3d 1053, 1063 (9th Cir. 2002). "Maintaining <u>Daubert's</u> standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony." <u>Id.</u> at 1064. As the district court noted, arguments regarding Ruel's qualifications may go to the weight, not the admissibility, of Ruel's opinion. In contrast, Ruel's failure to satisfy the relevancy requirement does not. It is essential that trial courts

---

[1] While Appellant suggests Ruel is a qualified expert, the fact remains that Ruel has never designed or manufactured a single firearm.

29

only allow relevant and reliable expert testimony to be presented to a lay jury to ensure that a fair trial is held.

In his brief to this court, Lee attempts to argue that there was evidence supporting Ruel's theory which the district court simply ignored. If Lee were to be believed, the only issue is whether or not the cylinder was open at the time of firing, and that evidence certainly existed from which the jury could infer that an open condition existed. This is a gross oversimplification and misrepresentation of Ruel's true theory.[2] In reality, Ruel's theory of the case is dependent upon a chain reaction series of events for which the factual foundation is non-existent. The chain of events is as follows:

1.    Lee failed to close the cylinder after loading.

2.    With the cylinder open, Lee attempted to pull the trigger but did not do so.

3.    Frustrated that he could not fire the revolver in the cylinder open configuration, Lee then pulled back on the thumb piece while simultaneously cocking the hammer.

4.    He then pulled the trigger a second time.

(See RE 46-11, Report of Roy Ruel, Page ID #1108.)

---

[2] The record is **not** disputed as to condition of the cylinder at the time of firing. The only witness who offered any testimony regarding the position of the cylinder at the time of firing was Mark Lee. He testified emphatically that the cylinder was closed. While plaintiff has offered incidental, post-accident observation suggesting that the cylinder was open after the incident, the observations are not relevant to the question of whether the cylinder was open at the time of firing.

While this court has acknowledged that there may be instances where a weak factual foundation is sufficient to allow expert testimony, no court has embraced the concept that a fictional account is permissible.  Lee can point to absolutely no facts in the record to establish or support the chain reaction series of events that is at the core of Ruel's defect and causation scenario.  Instead, in a last ditch effort to confuse the issue, Lee points to a series of completely irrelevant "facts" that do nothing to close the analytical gap between the facts and Ruel's testimony.  For instance, the fact that Lee's fingers are "close" to the thumb piece do not prove that the cylinder was open.  (See USCA, Document No. 006111812898, Brief of Appellant, at 17.)  The fact that his fingers were "close" to the thumb piece do not prove that he attempted to fire the revolver but could not would be due to the open condition of the cylinder.  Similarly, Lee attempts to argue that his injuries are "consistent with Ruel's expert recreation of the events." (Id. at 18.)  The notion that Lee's injuries are consistent with the accident scenario created by Ruel is one that is belied by Ruel's own statements.

In his report, Ruel attributed Lee's injuries to "high temperature pressure gas being expelled from the revolver."  (See RE 46-11, Report of Roy Ruel, Page ID #1111.)  Notably, Ruel offered no scientific data whatsoever to support his claim that this type of injury is associated with exposure to gas or flame when a round is

discharged.  In fact, Ruel admitted that he lacks the requisite qualifications to offer

any causation testimony:

> Q:      What is it about this injury that is consistent with exposure to
>          hot explosive gas?
>
> A:      I don't know.  I'm not a doctor.  I have no answer for that.

(See RE 46-5, Deposition Transcript of Roy Ruel, p. ID #771.)

Given Ruel's own admission that he is not a physician and has no idea

whether the injury sustained by the plaintiff is consistent with his accident

scenario, plaintiff's attempt in his brief suggesting that the injury supports the

reconstruction scenario does nothing but point out the errors in Lee's analysis.  By

the same token, the other supposed facts referenced in the brief do not fill the

analytical gap between Ruel's baseless reconstruction scenario and the facts of this

case.  As the district court recognized through its analysis, relevant evidence is any

evidence attempting to "make a fact more or less probable than it would be without

the evidence."  F.R.E. 401(a).  Here, a large frame hunting revolver that propels a

bullet in extreme velocity will make noise and produce a flash on discharge.

Third-party observations of a "loud pop" or "bright flash" tell us nothing about

whether Lee tried to pull the trigger but could not because the cylinder was open.

They tell us nothing about whether he manipulated the thumb piece to defeat the

hammer-stop feature.   Supposed scratches on the yoke tell us nothing about

whether Lee failed to close the cylinder.  The only "evidence" intending to prove

that the cylinder was open or closed which was presented to the district court was
the testimony of Mark Lee.  On this point, he was unequivocal:

> Q:    Were you able to close the cylinder?
>
> A:    When I re-chambered the third round, yes.

(See RE 46-9, Deposition Transcript of Mark Lee, p. ID #1034.)

> As the Supreme Court has made clear:
>
> The objective of Daubert's gatekeeping requirement is to ensure the
> reliability and relevancy of expert testimony.  It is to make certain that
> an expert, whether basing testimony on professional studies or
> personal experience, employs in the courtroom the same level of
> intellectual rigor that characterizes the practice of an expert in their
> relevant field.

See, Kumho, 526 U.S. at 152, 119 S. Ct. at 1176.  Expert testimony must be both
relevant and reliable, and where too great an analytical gap exists between the facts
and the opinion proffered, the testimony is properly excluded.  In this case, the
district court properly exercised its gatekeeping function and found that the
analytical gap was huge, and there are simply no facts which Lee can point to in
order to bridge the chasm.

## CONCLUSION

Acting in its capacity as the gatekeeper responsible for allowing only
reliable and relevant evidence to be admitted, the trial court did not abuse its
discretion in precluding the testimony of Roy Ruel.  The district court looked at the
totality of the evidence and found that the proffered testimony failed Daubert's fit

requirement.  The judgment of the district court was consistent with Rule 702 of the Federal Rules of Evidence and should be affirmed.  As such, **Appellee does not seek oral argument.**

## RELIEF REQUESTED

Appellee prays that this Honorable Court affirm the decision of the district court in granted its Motion to Exclude the Testimony of Roy Ruel Pursuant to Fed.R.Evid. 702.

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
   BOSICK & RASPANTI, LLP

By: *s/ Clem C. Trischler*
   Clem C. Trischler, Esquire
   *Pro Hac Vice* Admission
One Oxford Centre, 38th Floor
Pittsburgh, PA  15219
Telephone: 412-263-2000
Facsimile: 412-263-2001
E-Mail:  cct@pietragallo.com

*Counsel for Appellee,*
*Smith & Wesson Corp.*

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to FRAP 32(a)(7)(B) and (C), the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 7,547 words.

By: *s/ Clem C. Trischler*
　　Clem C. Trischler, Esquire

## DESIGNATION OF RELEVANT COURT DOCUMENTS

| Date | RE | Description of Entry |
|------|-----|---------------------|
| 09/14/2011 | 1 | Notice of Removal, Page ID #1–5 |
| 09/21/2011 | 4-4 | Smith & Wesson's Motion to Strike and Motion to Preclude the Testimony of Richard Ernest, Page ID #75, 78 |
| 09/21/2011 | 5-1 | Smith and Wesson's Memorandum of Law in Support of its Motion for Costs, Attachment 1, Page ID #90-91 |
| 10/17/2011 | 11 | Smith & Wesson Reply Brief in Support of its Motion for Costs, Page ID #369 |
| 08/08/2012 | 37-1 | Report of Smith & Wesson's Expert James C. Hutton, Page ID #628 |
| 11/26/2012 | 46 | Smith & Wesson Motion in Limine to Preclude Testimony of Roy Ruel, ¶¶1-4, Page ID #672-73 |
| 11/26/2012 | 46-1 | Smith & Wesson Brief in Support of its Motion in Limine to Preclude Testimony of Roy Ruel, Attachment 1, Page ID #681-82 |
| 11/26/2012 | 46-3 | Deposition Transcript of Roy Ruel, Page ID #727 |
| 11/26/2012 | 46-4 | Deposition Transcript of Roy Ruel, Page ID #745-46, 753 |
| 11/26/2012 | 46-5 | Deposition Transcript of Roy Ruel, Page ID #771 |
| 11/26/2012 | 46-9 | Deposition Transcript of Mark Lee, Page ID #1004-05, 1028-29, 1034-37 |

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of October, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

In addition, a copy of the foregoing was sent to:

Brittany L. Lee
611 S. Scott St.
New Orleans, AL 70119


By: _____*s/ Clem C. Trischler*_____

# ADDENDUM

2005 WL 4684238
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

LAVA TRADING INC., Plaintiff,

v.

HARTFORD FIRE INSURANCE
COMPANY, Defendant.

No. 03 Civ. 7037(PKC).    |    April 11, 2005.

**Opinion**

**_ORDER_**

CASTEL, J.

**\*1**  Plaintiff Lava Trading Inc. ("Lava") objects to a
53-page Report and Recommendation (the "R & R") of
Magistrate Judge Michael Dolinger. The R & R recommends
granting the motions of defendant Hartford Fire Insurance
Company ("Hartford") to strike the report of plaintiff's
principal damages expert, Eric Clemons, and preclude the
trial testimony of Clemons and another expert witness, Denis
O'Connor. Defendant Hartford has moved to strike plaintiff's
Objections as untimely.

Having reviewed the R & R, the submissions in support
and in opposition to Hartford's underlying motions, Lava's
Objections to the R & R and the six volumes of exhibits
submitted therewith, I find Magistrate Judge Dolinger's
Recommendation that the testimony of Clemons and
O'Connor be precluded under Rule 702, Fed.R.Evid., to be
well reasoned and thoroughly grounded in law, and adopt that
recommendation. Because Clemons's testimony is properly
precluded under Rule 702, I need not reach the issue of
whether his report also should be stricken pursuant to Rule
37(c)(1).

The background of this case, as well as the details of
Hartford's motions, are set forth in detail in Magistrate Judge
Dolinger's R & R and this Court's prior rulings, and I will not
repeat them here.

On February 14, 2005, Magistrate Judge Dolinger filed a 53-
page report recommending, _inter alia,_ that the Clemons and
O'Connor reports be precluded. The R & R concluded by

advising the parties that they had ten days from service of the
R & R to file any objections. On February 18, 2005, the Court
extended the time to file any Objections to March 9, 2005.
On March 8, 2005, noting that its Objections were due the
next day, Lava sought relief from the Court's 25-page limit on
memoranda (of law (a request the Court denied the same day),
but did not seek any relief from the March 9 deadline. On
March 10, 2005, at 4:03 a.m., Lava filed its Objections to the
R & R. (According to counsel for Hartford, it received a copy
of Lava's Objections via facsimile at 3:13 a.m.) Later in the
day on March 10, counsel for Lava faxed a letter to the Court
stating that "[w]ere unable to submit the Objection until after
midnight because of a technical problem ... which caused an
inadvertent and unintentional delay." Hartford subsequently
moved to strike plaintiff's Objections as untimely, and the
accompanying Certification of Jonathan Bauer as largely
legal argument and a flouting of the Court's 25-page limit on
legal memoranda.

As to the motion to strike, I will consider the Objections
(and accompanying Certification) despite their admitted
untimeliness. The Second Circuit has made clear that
although "a party generally waives judicial review of an issue
when he or she fails to make timely objection to a magistrate
judge's report, ... [t]his rule ... is a nonjurisdictional waiver
provision, and its violation may be excused in the interests
of justice." _DeLeon v. Strack,_ 234 F.3d 84, 86 (2d Cir.2000)
(citations omitted). Although Lava has not demonstrated that
the "interests of justice" excuse its late filing, the waiver rule's
purpose of promoting judicial economy by "prevent[ing] a
litigant from sandbagging the district judge by failing to
object and then appealing," _United States v. Male Juvenile,_
121 F.3d 34, 39 (2d Cir.1997) (citations and quotation
marks omitted; alteration in original), would not be served
where, as here, the Court chooses to review the R & R and
underlying motion _de novo. Id.; see also DeLeon,_ 234 F.3d
at 86-87. [1]  Indeed, "[e]ven if neither party objects to the
magistrate's recommendation, the district court is not bound
by the recommendation of the magistrate." 234 F.3d at 87
(citation and internal quotations omitted). As a result, I have
considered Lava's untimely Objections.

**\*2**  Having reviewed the R & R and Hartford's underlying
motions _de novo,_ I find that the R & R thoroughly reviews
the facts, canvasses the applicable law, and reaches the
appropriate conclusion, and I adopt it and conclude that the
testimony of Clemons and O'Connor should be excluded from
trial as failing to meet the standards set forth by the Supreme
Court in _Daubert v. Merrell Dow Pharmaceuticals, Inc.,_ 509

U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999) for reviewing the admissibility of expert testimony pursuant to Rule 702, Fed.R.Evid.

Magistrate Judge Dolinger sets forth, in great detail over more than 30 pages of his 53-page R & R, the facts and legal considerations relevant to defendant's *Daubert* challenge, and I decline to set aside that portion of the R & R. The Court agrees with Magistrate Judge Dolinger's finding that "Dr. Clemons'[s] proffered opinions of revenue loss fall well short of the essential requirements for usable expert testimony," and therefore should be precluded. R & R at 17; *see also Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,* 395 F.3d 416, 418-20 (7 th Cir.2005). [2]

For example, Exhibit GM-6 to the Myers Affidavit lists "a sample of products with documented 'S-curve' growth histories." The listed products consist almost entirely of durable goods, as opposed to the type of service from which Lava appears to generate its profits. *See also* Myers Exh. 10, Sultan et al., *A Meta-Analysis of Applications of Diffusion Models,* J. Marketing Research (1990) (conducting survey of use of diffusion models and concluding that "most reported studies fit into a particular category: they ... durable goods in the U.S." and that "estimating a diffusion model with few early datapoints has been shown to produce unstable parameter estimates"). [3]

In addition, from the Court's review of the record, Clemons appears to have based his estimate of Lava's "but-for," or *pro forma,* revenues on an S-curve that has its starting point pinned to September 2001, despite the existence of actual revenue data from the introduction of Lava's product at an earlier point in time. If one accepts that an S-curve model is an appropriate method of analyzing the potential adoption of Lava's products in a "but-for September 11" world, one would expect that the starting point of that analysis would not be September 11, 2001, but the actual introduction of Lava's product (which appears to have been in "early 2001" according to its experts or, according to Lava's July 2001 Business Plan, November 2000), with its known numbers.

But by no means are these the critical shortcomings of Clemons proposed testimony. He has taken assumptions given to him by Lava and embraced them and bolstered them with his own opinion without an adequate basis to support that opinion. Lava's projections and wishful thinking are not entitled to the added weight of the expert's supportive opinion unless there is a sound basis for that opinion. The *Daubert*

factors include: "-Whether a 'theory or technique ... can be (and has been) tested';

 **\*3**  -Whether it 'has been subjected to peer review and publication';

-Whether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and

-Whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.' *Kumo Tire v. Carmichael,* 526 U.S. at 150, citing *Daubert,* 509 U.S., at 592-594, 113 S.Ct. 2786. Depending upon the area of human knowledge that may be involved, other factors beyond those cited may have bearing, including an expert's "set of observations based on extensive and specialized experience." 526 U.S. at 157.

Dr. Clemons takes what he is told by Hessler of Lava concerning the total volume of potentially available business and the rate at which new clients would have engaged Lava's service and gives these assumptions the mantle of his expertise without a basis that is capable of objective scrutiny. Clemons accepts and embraces, for example, that Lava would have obtained 75% of the potential market without a methodology for an objective observer with the same expertise to determine whether the estimate was anything more than optimism on the part of Lava. The prejudice to Hartford is manifest in having a well-credentialed individual, such as Dr. Clemons, take the stand and give the Company's rosy scenarios the aura of reliability when there is not an adequate basis for them to earn expert validation. Inputting those figures into a "diffusion model" does not enhance their reliability. I agree that the testimony does not meet the threshold for admissibility.

As the Magistrate Judge noted, because Lava concedes that the report of another of its damages experts, Mr. O'Connor, is derivative of Dr. Clemons's report, I agree that the O'Connor's proposed expert testimony should also be precluded. [4]

Defendant's motion for summary judgment on the ground of speculative damages is denied without prejudice to its renewal as a motion for judgment as a matter of law. *See* Rule 50, Fed.R.Civ.P.

Lava's motion to preclude the testimony of Benn Steil and Chris Campos, Hartford's damages experts, is denied. The

Westlaw Next © 2013 Thomson Reuters. No claim to original U.S. Government Works.

proposed experts appear qualified to give the proffered opinions and there is a sufficient basis and apparent reliability to the proposed testimony so as not to preclude it at this juncture.

### CONCLUSION

Defendant's Motion to Strike plaintiff's Objections is DENIED. The Magistrate Judge's Report and Recommendation is ADOPTED a set forth herein. The proffered expert testimony of Clemons and O'Connor is precluded under Rule 702, Fed.R.Evid. Summary judgment in favor of Hartford on the ground that damages are speculative as a matter of law is DENIED.

SO ORDERED.

### REPORT & RECOMMENDATION

DOLINGER, Magistrate J.

On October 6, 2004, defendant Hartford Fire Insurance Company applied for an order (1) striking the Rule 26(a)(2)(B) report of plaintiff's principal damages expert, Dr. Eric Clemons, and (2) precluding plaintiff from calling Dr. Clemons as a witness at the forthcoming trial. Alternatively, defendant urged that at least a portion of Dr. Clemons's testimony be precluded and that defendant be awarded the expense of its follow-up deposition of the witness. The basis for Hartford's application was its contention that Dr. Clemons's report-or, more precisely, both the original and the supplemental reports prepared by Dr. Clemons-were manifestly inadequate to meet the requirements of Fed.R.Civ.P. 26(a)(2)(B), and that materials created by the witness after the second report had been provided did not cure the deficiencies and furthermore necessitated a second deposition session. (See Oct. 6, 2004 letter to the Court from Stephen E. Goldman, Esq.; Nov. 1, 2004 letter to the Court from Rebecca Levy-Sachs, Esq.).

**\*4** While that motion was being briefed, defendant conducted a two-day deposition of Dr. Clemons. [1] Following the completion of that deposition, defendant has separately moved to preclude any testimony by Dr. Clemons and by a second damages witness, Mr. Denis O'Connor, based on its contention that Dr. Clemons's proposed testimony does not meet minimum standards for admissibility under Fed.R.Evid.

702. (See Deft's Nov. 15, 2004 Supplemental Memorandum in Support of its Motion to Preclude).

Both motions have now been fully briefed. For the reasons that follow, we conclude that defendant's complaints are substantially justified and therefore recommend that both motions be granted. [2]

### Background

Plaintiff Lava Trading Inc. is self-described as "a technical service bureau for connectivity to all major U.S. equity market liquidity services." (Compl. at ¶ 2). In substance, it is a provider of software and communication links for a portion of the securities industry that utilizes so-called order-management systems.

Lava maintained business premises in the World Trade Center prior to September 11, 2001. Its premises were covered by policies issued by Hartford that insured against property loss and business interruption. In the wake of the destruction of the Trade Center, Hartford paid Lava for its lost property and later paid plaintiff another sum for estimated business-income losses and related expenses resulting from the destruction of its premises. [3] Lava demanded additional amounts, which Hartford declined to pay, and in 2003 Lava sued, contending that it was owed substantially more money under its policies.

In preparing its case for trial, Lava designated Dr. Clemons as a damages expert. His role was to estimate the amount of revenue that Lava would have realized from its business in the period between September 2001 and October 31, 2002 if the events of September 11, 2001 had not occurred. [4] According to plaintiff, another designated expert witness, Denis O'Connor, was to utilize the lost-revenue figures provided by Dr. Clemons to opine as to plaintiff's recoverable damages.

Clemons prepared a report dated August 16, 2004 (Goldman Oct. 6, 2004 letter to the Court at Ex. 1), in which he concluded that, from September 11, 2001 until the end of October 2002, Lava had lost a total of $56,539,621.00 in sales revenues as a result of the interruption to its business caused by the September 11 attack. (Id., Ex. 1, Report at p. 13, Table 1). [5] He further estimated a loss in revenues to Lava assertedly caused by Hartford's alleged failure to advance in a timely fashion the moneys that it did pay Lava, concluding that this consequential loss over the same time period totaled $4,810,303.00. (Id., Ex. 1, Report at p. 13, Table 2).

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

The August 16 report alluded in very broad terms to some of the factors that Dr. Clemons was evaluating, including a very general statement to the effect that he believed that the September 11 attack had delayed Lava's development and launch of new products because its personnel were largely focused on recovery efforts. The report, however, did not describe (1) the specific facts-including, for example, prior and subsequent performance data, and market size-that Dr. Clemons may have relied upon, (2) the specific computational model (if any) that he had used, or (3) the details of what use he was making of pre-existing data, as well as his mathematical calculations, to arrive at the very specific projected monthly lost-revenue totals that he was estimating. Rather, he stated only that he was using unspecified "estimates" provided to him by George Hessler, Lava's Director of Broker Dealer Sales, to develop an unspecified "total growth potential of the industry," and that he was then using an unspecified growth or "traction" curve to project the amount of new business that Lava would have attracted over the following twelve and one-half months but for the September 11 attacks. (*Id.,* Ex. 1, Report at pp. 11-12). Although this description implied that he was doing specific calculations utilizing data reflecting past revenues and expenses, as well as specific estimates of market size and potential for expansion by Lava, Dr. Clemons never departed from this grossly impressionistic level of generality to describe what in fact he was doing to reach his dollar figures. Indeed, his only disclosure of any data or calculations was a chart at the end of the report that simply listed, on a month-by-month basis, Lava's actual revenues and the amount of revenues that Dr. Clemons thought that Lava would have earned if not for the events of September 11. (*Id.,* Ex. 1, Report at p. 13, Table 1). In short, how Dr. Clemons had derived the revenue-loss numbers was left a complete mystery.

**\*5** As for the figures that Dr. Clemons arrived at to represent the loss caused by purported delay on the part of Hartford in advancing funds to Lava on its business-loss claim, he described in very general terms the derivation of a "good faith curve", which appears to have been premised on the notion that if Hartford had made "a promise" of more money to Lava in December 2001 or had actually paid it then (*id.,* Ex. 1, Report at p. 11, ¶ 5.3.3), the company could have hired more personnel, who could have more quickly developed new products and attracted more business from December 2001 through October 2002. (*Id.,* Ex. 1, Report at pp. 11-12). Based on the further premise that

Lava could not obtain alternative funding until April 2002, Clemons apparently did a hypothetical calculation that, in effect, advanced by two months Lava's actual revenues and measured the difference between the resulting amount of revenue from December 2001 through October 2002 and the so-called "actual revenue" curve (that is, the revenue Lava in fact realized in the post-September 11 period). (*Id.*). This difference he then manipulated in an unspecified manner to ensure that price cuts made by Lava in the Spring of 2002 because of competition not also be advanced by two months in his analysis. (*Id.* at p. 12). He then arrived at a final figure for the loss caused by Hartford's alleged delay in payment.

Upon receipt of this report, defendant objected that it was patently inadequate under the governing rules. Plaintiff subsequently agreed that it would have Dr. Clemons supplement his initial report. [6] Dr. Clemons supplied a second report, this one dated September 20, 2004. (Goldman Oct. 6 letter to the Court, Ex. 2).

The new report was in large measure the same as the first, both in substance and in format. It did not include any further description of the data on which Dr. Clemons relied or the method by which he derived his estimates of loss, nor did it disclose any of his mathematical computations. The principal change was that Dr. Clemons increased his estimate of the revenue loss sustained by Lava from the September 11 attacks by approximately $11 million, and his estimate of the loss occasioned by Hartford's assertedly delayed payment by more than $2 million. Thus he now listed, in his month-by-month revenue chart, a total loss of $67,418,566.00 attributable to the September 11 attack. (*Id.,* Ex. 2, Report at p. 14). As for Hartford's asserted delay in payment, he listed a total loss of $7,001,045.00. (*Id.*). [7] The report did not explain these alterations, any more than it explained how the original figures had been derived in the first place. [8]

Following receipt of the second report, defendant's counsel again objected, noting that the report failed to provide the basis for Dr. Clemons's opinions. As articulated by counsel, "While [Dr. Clemons] includes a Pro Forma Income projection, there is no explanation as to how the numbers were derived, and they do not comport with the Projected Revenues contained in the Lava claim submitted to the Hartford, in or about late 2002 in the amount of $59,000,000.00. The work sheets or spreadsheet calculations used to create the Pro Forma Projections, which are the sole basis for his conclusions, are required to be produced under Rule

26(b)." (Oct. 1, 2004 letter from Rebecca Levy-Sachs, Esq. to Jonathan Bauer, Esq. & Jeremy Flanagan, Esq.).

**\*6** This complaint triggered a responding letter in which plaintiff's counsel did not purport to proffer the necessary explanations on behalf of the witness. All that she did was to attach a series of spreadsheets listing numerous columns of dollar and percentage figures that appear to relate to certain listed clients or prospective clients of Lava. No explanation of the derivation or meaning of these numbers was offered, and counsel simply advised that "the explanations Hartford is seeking can be explained at [Clemons's] deposition." (Oct. 5, 2004 letter from Lauren C. Bisordi, Esq. to Rebecca Levy-Sachs, Esq.). At that deposition, Dr. Clemons identified the spreadsheets as reflecting a sensitivity analysis that he had performed after the completion of his revised report. (Dep. Tr. at 81-90).

The deposition of Dr. Clemons began on October 15, 2004. It could not be completed that day, in part because it turned out that plaintiff had not produced, and the witness and his attorney did not then have, the written materials that might have revealed (1) Dr. Clemons's mathematical calculations that yielded the revenue loss figures that he had adopted, (2) the specific assumptions upon which the analysis was based, and (3) the specific S curve that had been utilized to derive the numbers. (*See* Dep. Tr. 101-04, 142-44, 160-61).

In the wake of the first deposition session, Dr. Clemons created some additional materials to reflect his up-dated calculations, including a revision of the sensitivity analysis of his prior estimates. Some of these materials were not provided to defendant prior to the next session of the deposition, which was conducted on October 27, 2004, but rather were handed over midway through the second session. (Dep. Tr. at 316-18. *See* Nov. 1, 2004 Levy-Sachs letter to the Court at Ex. B). These sheets showed estimated revenue figures, premised on varying-if very general-assumptions, and reflected what Dr. Clemons described as "lost revenues" of between $90 million and $110 million. (*Id.*).

Following the conclusion of Dr. Clemons's deposition, defendant moved to preclude plaintiff from calling him as a witness, arguing that, apart from the inadequacies of his various reports and supplementations, his analysis does not meet minimum standards of reliability and utility under Rule 702 and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and its progeny. The parties have proffered multiple and voluminous rounds of papers on

this matter, the briefing of which was completed with the submission of last-minute letters to the court on January 12, 2005.

## ANALYSIS

### I. *The Expert Witness Reports*

As amended in 1993, Rule 26(a)(2)(B) requires that a party who has designated an expert witness for trial provide a report prepared and signed by that witness. The report must, among other things, "contain a complete statement of all opinions to be expressed and the basis and reasons therefor; [and] the data or other information considered by the witness in forming the opinions;...." The expert must also provide "any exhibits to be used as a summary or support for the opinion" and a variety of other information about the witness's prior experience, including publications and prior testimony. Fed.R.Civ.P. 26(a)(2)(B).

**\*7** As this language suggests, the report pertaining to the proposed opinions of an expert and their factual basis must be "detailed and complete". (Fed.R.Civ.P. 26(a)(2)(B), 1993 Advisory Committee Notes, at 160 (West 2004 Rev. Ed.)). This requirement is intended to ensure adequate trial preparation, including the opportunity for efficient follow-up discovery through deposition, if necessary. (*See* Fed.R.Civ.P. 26(b)(4)(A)).

Under Rule 26(b)(4)(A), the discovering party is afforded the opportunity, as a matter of right, to depose the other side's expert. This provision deviates from its predecessor, which allowed such inquiry only upon court authorization. The rule further specifies, however, that the deposition is to be conducted only after the expert provides the required report. In this fashion the drafters anticipated that depositions would be significantly shortened and narrowed, and in some cases the need for the deposition might be entirely obviated. (*See* Fed. R. Civ. Proc. 26(a)(2)(B), 1993 Advisory Committee Notes, *supra,* at 161). *Accord, e.g., Salgado v. General Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir.1998)("The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.")(citing cases).

Judged by these standards, Dr. Clemons's report in both its versions, and as supplemented by the October 5 letter from plaintiff's counsel, was manifestly inadequate. As we have

Case: 13-3597    Document: 39    Filed: 10/15/2013    Page: 49

noted, it offered a very specific set of ultimate opinions, that is, a precise set of figures for estimated monthly revenue losses assertedly caused-over a twelve-and-one-half-month period-both by the effects of the September 11 events and by the purported delay in payment by Hartford. It failed, however, to identify either (1) the specific facts or factual assumptions on which Dr. Clemons relied to generate his opinions or (2) the methodology that he used (other than in the most general and unhelpful terms) or (3) his actual calculation of the losses or (4) the basis for the dramatic alteration of his loss numbers from the first to the second report. In short, the report-in all its manifestations and supplementations-did not disclose any of the essential details needed to understand and assess Dr. Clemons's conclusions. *See, e.g., Salgado,* 150 F.3d at 741-42 n. 6 ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.")(citing cases). It follows as well that the report failed to offer any prospect for narrowing or focusing the deposition of the witness, much less obviating the necessity for such a deposition.

The failure of the plaintiff and its expert to meet the requirements of Rule 26(a)(2)(B) is further underscored by what occurred at the deposition. As noted, the first session had to be adjourned because plaintiff had still concededly not provided even the calculations that the witness had undertaken to arrive at his ultimate figures. (Dep. Tr. at 160-61). Moreover, the witness generated additional calculation materials between deposition sessions, but plaintiff did not share some of them with defendant until midway through the second session of the deposition. (Dep. Tr. at 316-18).

 **\*8**  Finally, we note that on the current *Daubert* motion, plaintiff has proffered extensive new affidavits by both Dr. Clemons and Dr. Glenn D. Meyers, a consulting economist who assisted him, in which they offer new explanations, new analyses and a set of demonstrative exhibits (including charts and graphs) never before produced. This new effort only underscores the failure of the original and revised reports of Dr. Clemons to describe the essential details of his analysis. Moreover, these affidavits, if viewed as an effort to supplement Dr. Clemons's original reports, do not salvage plaintiff's position on the current Rule 26(a)(2)(B) motion.

The court's scheduling order required plaintiff to provide its expert-witness reports by August 16, 2004. Despite-or perhaps because of-the manifestly inadequate content of the first report, plaintiff was afforded the opportunity to

supplement, more than one month later, and yet it failed to take advantage of the opportunity, choosing instead to provide a recycled version of the first report, with the same blatant deficiencies and higher dollar figures. Plaintiff remained in substantial default up to and through the two-session deposition of Dr. Clemons and through the briefing of defendant's Rule 26(a)(2)(B) motion in October and November 2004. A more complete disclosure-albeit without any additional backup documentation-did not finally occur until plaintiff's response to defendant's current *Daubert* motion, in December 2004, long after the end of expert discovery.

In short, the affidavits, if deemed to be new expert submissions, are plainly and substantially untimely. Under the terms of Fed.R.Civ.P. 37(c)(1), such untimely submissions are not admissible unless the proponent of the evidence can demonstrate that his delay in complying with the required deadlines was "substantially justified" or that it was harmless, that is, that it did not prejudice the other side. *See, e.g., Wilson v. Bradlee's of New England, Inc.,* 250 F.3d 10, 21 (1 st Cir.2001); *American Stock Exchange v. Mopex, Inc.,* 215 F.R.D. 87, 93 (S.D.N .Y.2002). Indeed, as one court has recently noted, untimely produced evidentiary materials, including expert submissions, are subject to "near automatic exclusion" under Rule 37(c)(1). *Wilson,* 250 F.3d at 20-21. Plaintiff in this case fails to make the required showing.

Lava had ample time to provide the required expert-witness submissions, and was afforded additional time to correct the initial report. Nonetheless, plaintiff failed to do so. Indeed, full disclosure did not occur until Lava was faced with the current *Daubert* motion to preclude. Moreover, there is no mystery as to the requirements of Rule 26(a)(2)(B). In short, plaintiff shows no justification, substantial or otherwise, for its course of conduct.

Plaintiff also fails to demonstrate harmlessness. Indeed, the extraordinary delay in the presumably definitive presentation of the basis for Dr. Clemons's opinions has unquestionably prejudiced defendant, since Hartford has been forced to pursue a full explanation through an extended set of depositions and then motion practice, only to receive an altered presentation long after the close of discovery and long after defendant had already obtained an analysis by its own expert of the plaintiff's preceding submissions.

 **\*9**  In sum, defendant is fully justified in challenging the adequacy of plaintiff's disclosure of Dr. Clemons's analysis

and opinions. We describe the appropriate remedy after we have addressed defendant's challenge to the substance of Clemons's proposed testimony.

## II. *The Daubert Challenge*

### A. *General Standards*
At the conclusion of the deposition of Dr. Clemons, defendant filed a separate motion to preclude his testimony on the ground of its asserted unreliability. Plaintiff has opposed this application. We conclude, however, that Dr. Clemons' proffered opinions of revenue loss fall well short of the essential requirements for usable expert testimony, and that under *Daubert* and its progeny that testimony should be precluded.

Rule 702 specifies that expert witness testimony is admissible only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The gate-keeping role of the court under this rule is to be exercised in accordance with the criteria outlined by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and later applied not only to scientific testimony or evidence, but to all expert opinions and evidence. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999).

Under *Daubert,* the trial court must determine that the "testimony is not only relevant, but reliable." 509 U.S. at 589. In doing so, the court must undertake a two-step analysis in assessing the proposed testimony of a qualified expert. Thus, the judge must determine, at least on a preliminary basis, "whether the reasoning or methodology underlying the testimony is scientifically valid," and he must further decide "whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592. In short, the trial court must decide not only whether the methodology is reliable for some purposes, but whether it is reliable "in light of the particular facts and circumstances of the particular case," that is, whether the method or technique is a reliable way "to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Kumho,* 526 U.S. at 153-58.

For scientific methods, the *Daubert* Court suggested that, in considering general reliability, the trial judge assess whether the method or theory "can be and has been tested." *Daubert,* 509 U.S. at 593. The court should also look to whether it

has been subjected to peer review and publication, the degree to which it has been accepted in the relevant profession or discipline, and the known or potential error rate of the methodology. *Id.* at 593-95. For methods or theories that are not purely scientific, the court should follow the same general approach, adapting the *Daubert* criteria as needed for the purpose of assessing reliability. *See Kumho,* 526 U.S. at 150.

**\*10** As for the second step of the analysis, the court must consider whether the methodology or theory is appropriate for the particular issue or task for which it is being used, and must also assess whether the witness is applying it in a manner that ensures a reliable linkage between the facts that he is examining and the conclusions that he is announcing. As the Supreme Court has noted in this context:

> Conclusion and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elect. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

Bearing these criteria in mind, we turn to the record before us. In assessing the adequacy of Dr. Clemons's proposed testimony, we note that it is plaintiff's burden to demonstrate that it satisfies the relevant criteria. *See, e.g., Zaremba v. GMC,* 360 F.3d 355, 358 (2d Cir.2004); *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5 [th] Cir.1998). Plaintiff fails to do so in this case.

### B. *What Dr. Clemons Did*
Dr. Clemons was charged by Lava with the task of arriving at an estimate of the revenues that plaintiff would have earned through October 31, 2002 had the September 11 attack not occurred. As explained in general terms in his deposition, he started by positing an estimate of the total volume of business potentially available to Lava if it had been able to capture the entire available market for its products and services. To do so, he adopted an estimate orally conveyed to him by Lava

employee George Hessler in the summer of 2004. (Dep. Tr. at 74, 90, 108-10, 266-67, 269).

Clemons then adopted an estimated rate of client "capture" on a month-by-month basis during the relevant period, that is, an estimate of how rapidly and broadly plaintiff would have signed up potential customers if the September 11 attack had not occurred. (Dep. Tr. at 113-14). [9] Again, he relied on Mr. Hessler to provide such a set of estimates, and he viewed Hessler's estimates as "plausible" because he considered Lava's most successful product-the so-called Color Book-to be a "must have" item for at least the over-the-counter ("OTC") portion of the securities industry. (Dep. Tr. at 63-64, 66-67, 113-18). [10] He also adopted Hessler's estimate that, in the period between September 2001 and October 2002, Lava would have captured approximately 75 percent of the potential market. (Dep. Tr. at 13-14, 147-49). [11]

According to Dr. Clemons, Hessler's revenue estimates for the relevant period, if graphed, would yield an S-shaped curve. (Dep. Tr. at 253-55). He suggested that such a curve lends plausibility to Hessler's projections, because new products, when successfully placed in the market, typically generate sales volume and revenue over time in an S-shaped curve; that is, initially sales are slow, then they accelerate as the product is accepted more widely, and then they slow down as the market approaches saturation or sales are constrained by the entry of competitive products. (Dep. Tr. at 114-20; *see also id.* at 146-48, 261). [12]

 **11** In adjusting Hessler's estimates, Dr. Clemons reported adding a few refinements. These included a modest reduction for a portion of the revenue estimates to account for the impact of decimalization by the Exchange, a further minor decrease to account for some competition by at least one other company that he viewed as a late-arriving competitor for a portion of Lava's business and to account for the possibility that some trading houses would develop their own products in-house, and a small adjustment to reflect a revenue cap that limited payments to Lava from Merrill Lynch. (Dep. Tr. at 74-75, 93-94, 98, 130-31, 144, 245-48, 334-36, 368-70).

Finally, Dr. Clemons reported doing a sensitivity study during the period after preparation of his two reports. (Dep. Tr. at 233). As he described the study, he retained his assumptions that Lava had begun the relevant period with approximately 7.9 percent of the potential market and would have ended it with 73 percent of the market for the "must have" product.

(Dep. Tr. at 256-58, 282-83). He then varied the rates of acquisition of new business during the relevant period in different directions-that is, both up and down-to see how such changes would affect the total of projected revenues. (Dep. Tr. at 297-98, 326, 329-30, 342-43). He concluded that, under a range of varying assumptions, revenues would very likely have totaled somewhere between 90 and 110 million dollars (presumably reflecting an actual revenue loss to Lava of between approximately 60 and 80 million dollars). (Dep. Tr. at 289-90).

Dr. Clemons also undertook to determine the effect on Lava's revenues, in the actual post-September 11 scenario, of Hartford's failure to pay two million dollars to Lava in December 2001. In doing so, he simply shifted, by three months, Lava's actual revenues during the period from January through October 2002. (Dep. Tr. at 390).

### C. *The Witness's Qualifications*

In attacking Dr. Clemons's proposed testimony, defendant initially argues that, entirely apart from the serious problems with his methods and their application in this case, he is simply unqualified to perform the form of analysis that he is proposing to do for the trier of fact. (*See* Deft's Nov. 15, 2004 Supplemental Memorandum in Support of Its Motion to Preclude at 17-19). Although defendant's challenge in this respect has some force, we find it unnecessary to rely on that ground in determining that the testimony should be precluded.

Judged by Dr. Clemons's extensive curriculum vitae-which is as long as, and far more detailed than, his expert's report (*compare* Oct. 6, 2004 Goldman Letter to the Court at Ex. B (Expert Witness Statement) *with id.* at Ex. B (Vita of Eric K. Clemons))-he has considerable experience in the areas of information technology for the financial markets, corporate strategic decision-making, pricing strategies and aspects of marketing. He has focused on the impact of evolving information technology on the securities industry and has been called upon on occasion to undertake predictive exercises concerning the anticipated success of new products and services. (Dep. Tr. at 10-24, 45-49; Oct. 6, 2004 Goldman letter to the Court, Ex. B (Vita at 1-3)).

 **12** Defendant points out that Clemons is neither an economist nor an accountant and does not profess any expertise in either area. (Dep. Tr. at 14, 31). Indeed, by his own testimony, Clemons assiduously avoids accounting data. (Dep. Tr. at 31). Moreover, he has not previously undertaken the type of exercise that he was requested to do here, that is,

to conduct a systematic and reasonably precise assessment of how a business would have performed over a specified period of time but for the occurrence of an intervening event. (Dep. Tr. at 27, 34, 45). [13]

Defendant also points out that although Clemons has testified in a number of fora on a diverse range of topics, none involved anything remotely approaching the nature of the task that he was requested to perform in this case. Thus, for example, he has prepared reports or testified about the quality of softwar provided by a vendor to a bank (Dep. Tr. at 10), about the role of smart cards in banking in Europe and the United States, as well as the degree of competition between various card issuers (Dep. Tr. at 11-13), about technical and financial constraints in code development for softwar design and its relationship to the Y2K issue (Dep. Tr. at 16-18), about the design and utility of a patented program owned by Lava (Dep. Tr. at 19-20), about the uniqueness of a patented invention owned by Priceline (Dep. Tr. at 21), and about the technology of trading support systems. (Dep. Tr. at 22-24).

It is at least questionable whether Clemons has the training and experience to offer a reliable estimate of lost or future revenues for a product, even one within the area of his technical expertise. Indeed, to the extent that he has apparently previously applied the type of analysis he utilized here, it was to assess future strategies by businesses (Clemons Aff. at ¶ 3.5.3; Dep. Tr. at 352 (models used to make "policy recommendations"), [14] an exercise that does not meet the requirement for a lost-profit assessment, which demands a far greater degree of precision in analysis. *See, e.g., Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986)(requiring "reasonable certainty"). This pattern suggests a serious question as to whether he is even minimally qualified to be certified as an expert for the purpose of doing a lost-revenue estimate.

In any event, we need not rest our recommended resolution of defendant's application on the relatively narrow ground of qualifications, that is, the precise contours of the witness's training and experience, which are plainly extensive in the particular areas of his expertise. Rather, the methods that he has chosen to use and his application of them to the facts of this case provide ample bases for recommending against allowing him to testify to his revenue-loss opinions.

**D. *General Reliability of the Method***

We start by noting that, despite the use of terminology that might imply a degree of rigor in analysis-for example, capture rates, S curves, good-faith curves and *pro forma* revenue measurements-the actual process undertaken by Dr. Clemons to determine losses caused by the September 11 events bears none of the hallmarks of a reliable method for measuring lost income. The same conclusion applies to his calculation of Lava's delayed-payment loss.

 **\*13**  To calculate the September 11 lost revenue, in substance he accepted the orally communicated estimates of Lava's employee, Mr. Hessler, as to the essential numbers that would drive his ultimate conclusions-that is, the potential size of the market for Lava's products during the pertinent period, Lava's actual and potential customers, the rapidity and extent of client "capture" that would have taken place absent the September 11 attack, and the extent of market penetration (about three-quarters of the potential OTC market) that would have occurred by October 31, 2002 in such conditions. He also did not contemporaneously document any of the conversations that he had with Mr. Hessler concerning these matters, [15] and he did not require Hessler to substantiate with any specificity the basis for his estimates. He also chose not to take into account any hard data as to Lava's pre-September 11 performance and its own nearly contemporaneous (that is, July and August 2001) projections of expected performance for the pertinent period.

The impressionistic nature of this aspect of the process is best captured by Clemons's own descriptions of some of what occurred. Thus, in his deposition he admitted giving no weight to Lava's far lower July 2001 sales projections for the relevant time frame-even though these had been done before Lava had an incentive to overstate its prospects-because he had spoken to Lava representatives in July or August 2004, and "their sense was" that the old projections (dating from only one or two months before the loss) were "too conservative". (Dep. Tr. at 120-22). [16] The choice to disregard these projections enabled Clemons to arrive at an estimate of revenue that was approximately three times as large as the company's own July 2001 projections, [17] and that assumed that in October 2001 Lava would have doubled its assumed September revenues, that the next month it would have tripled the September assumed revenues, and that in December it would have quadrupled those figures. (*See* Goldman Oct. 6, 2004 letter to the Court, Ex. 2, Report at p. 14). [18]

As for the potential size of the market, Hessler provided these numbers to Clemons on a desk-by-desk basis. Clemons just "eyeballed" them and had a conversation with Hessler about them during which Hessler assured him that the estimates were reliable. Clemons did not seek any form of specific verification or documentation for them from Hessler. (Dep. Tr. at 134-38). Moreover, although Hessler reportedly used so-called comparables for many of the potential customers [19] -that is, data from other, purportedly similar, firms to estimate potential business for Lava from the targeted firm-Clemons never inquired as to the specifics of the firms that Hessler had used as comparators. (Dep. Tr. at 270-72). [20]

With regard to the proffered opinion of Clemons that Lava would have won control of 73 percent of the potentially available OTC market by the end of October 2002, in contrast to its actual 16 percent at that time (*see* Ackerman Trans. Aff. at Ex. 12), Clemons again relied on Hessler and offered the following explanation for adopting Hessler's number:

> **\*14** I asked [Hessler], you know, why not 70, why not 50, why not 90. And his sense was that he captured about 70 to 75 to 80 percent of the market, in a time period that was delayed by six months. And if-in other words, we shift the adoption 75, 73, 78 percent saturation, it seems about the saturation he got.

(Dep. Tr. at 257-58). When asked about his assertion that Lava had gotten three-quarters of the potential OTC market by the Spring of 2003, Clemons responded:
You know this is a conversation which is, therefore, you're not memorialized in notes. It was a conversation where he said within roughly six months of the end of my analysis, which was we went through what, October of '02, and said by, you know, early '03 he had captured 12 of the top 16 firms, which is what, 75 percent. He had another-by other calculations he'd captured 14 of 16 because two of them were trading with him a little bit. So now he thinks he's got 80 percent. I figure something between-just below 75 percent would have been correct.

(Dep. Tr. at 259-60). Clemons later confirmed that he had not verified Lava's claim that it had attained 73 percent of the OTC market in the Spring of 2003. (Dep. Tr. at 322-23)

("I think the most accurate way to respond is that as I sit here, Lava assured me that their total revenues for a period roughly six to eight months out were equivalent to my pro forma revenues for 2002, for October 2002.").

When asked for his basis for assuming that whatever sales level Lava purportedly achieved in the Spring of 2003 would have occurred in October 2002 but for the September 11 events, Clemons stated:

> Well, you know, it's-the question is if we hadn't lost two months, really, when the markets were crippled, if we hadn't lost four months when Lava was financially crippled, we'd have been six months ahead of ourselves. Now, I can-if-there are ways to fit actuals before and actuals after and do the kind of revenue shifting that we did for the good faith curve. But it seemed reasonable to peg the far end. I don't want him giving himself a hundred percent. And it seemed reasonable to peg the far end as where he would have been but for a six month delay.

(Dep. Tr. at 260-61). [21]

Faced with the fact that by October 31, 2002 Lava had acquired less than twenty percent of the potential OTC market, Clemons recited his belief that the difference between this figure and Hessler's projected 73 percent control resulted from the events of September 11. In support of that belief he offered the following:

> Again, the sense I have is that they were delayed approximately six months, and the reason for that is clearly October, November they were crushed. Just as clearly, December, January, February and March they were financially starved. Clearly through January February they were less than fully connected.

(Dep. Tr. at 308). Ultimately, however, when asked for his explanation for the 67-million-dollar difference between the revenues Lava actually earned and his estimate of *pro forma* revenues for the same period, Clemons said simply that he had asked Lava's representatives

**\*15** could they have achieved the 97 in that time period but for. In other words, I wasn't looking for an explanation of the discrepancy [of 67 million dollars]. The explanation of the discrepancy is contained in thousands of pages of deposition transcripts and it's contained in the rubble [of the World Trade Center].

(Dep. Tr. at 451-52).

As Clemons explained his method, he was specifying "the total size of the pool" and finding "an adoption rate," "a pricing rate," and "a competitive impact rate," and putting them together to "see what a revenue stream looked like." Admitting that this approach did not involve an accounting analysis, he conceded the need for "a reality check," and he said that his "reality check is the discussion I had with George [Hessler]," that is, "Did you ever hit those volumes. The answer is yes, we did in '03. Did you hit those revenues. No, we didn't because by '03, we were giving price rebates back." (Dep. Tr. at 452-53).

As for the speed of the hypothetical growth projected by Hessler and adopted by Clemons, the witness was asked to state the basis for projecting the growth in Lava's revenues-by way of example-in October 2001 and in November 2001, representing roughly a 200 percent growth in revenues in two months:

Q: Did you do anything independently other than speaking to [Lava representatives] to verify through analogous products or markets whether they could have ramped up from 7.9 percent in September to 24 percent in November given their financial situation, excluding 9/11?

A: The answer is only sort of. And here's the sort of. The sort of is if they signed a large firm like Cantor. They had two or three firms, I remember, with very high probability of signing up. And if the firm had already ordered the lines, which Cantor had, could they have lit up a comparable volume in October. I believe they could have. Could they have lit up a comparable volume in November. Well maybe it should be another eight percent and that would give me 24. Could they have done even more in December. If they had-if they signed up two large clients, not two large clients, if they had continued two months of spectacular growth, they would have acquired the staff.

I don't find the numbers implausible, given the rate of growth in September. I don't want the numbers implausible, given my what's the word I want-anecdotal experience with other really attractive corporate products launched at the right time.

(Dep. Tr. at 302-03).

Having pegged the start of the *pro forma* revenue curve at 7.9 percent of the presumed total OTC market for September 2001 and at 73 percent of the market as of October 31, 2002, Dr. Clemons relied on Hessler's guesses about monthly revenue rises. Although Dr. Clemons adjusted these numbers modestly to account for the effects of (1) competition, (2) decimalization and (3) a revenue cap on payments by Merrill Lynch, he provided no systematic basis for the nature or degree of the discounting.

**\*16** With regard to Clemons's estimate of revenue loss attributable to delayed payment by Hartford, his explanation for his three-month shift of revenue was equally diffuse.[22] If

that money would have been forthcoming in December, Lava could have on the basis of that, hired additional personnel, they could have taken action sooner than they did. People could have been hired to light up, which is relatively straightforward work, do the installation while their developers continued to do the more sophisticated work required to light more customers.... The sense I had from Lava, and this is based on numerous depositions and interviews, is that if they had had money in December, by January they could have been operating at the level that they did not eventually achieve until April.

(Dep. Tr. at 392-93). When asked about the specific basis for this assertion, Clemons retreated to saying that it was based on a conversation with one Lava official, Kamran Rafieyan, and that

his sense was-and again he convinced me of this-his sense was that with money in hand in December, people being hired in December, he could be-his new people could be reinstalling and his existing people could be installing, and it would have shifted his revenue curve by three months.

(Dep. Tr. at 394-95).[23]

Clemons's approach fails to offer a reliable basis for his revenue-loss estimates. As observed, he appears to have done the following: (1) taken as his starting point Lava's hypotheses about market potential and "but for" performance at a time when the company had every incentive to maximize its guesses as to how it would have done "but for" September 11, (2) ignored the client's far lower estimates made shortly before the event in question but at a time when Lava did not have the same incentive to exaggerate its prospects, (3) adopted Lava's proffered numbers after having "eyeballed" them and having had unrecorded and undocumented general discussions with the company's representative about his "sense" of their accuracy, (4) assumed *a priori* that if Lava achieved a certain higher volume six to eight months after the pertinent period, that increment would have been achieved during the earlier period but for the loss of the World Trade Center premises,[24] (5) declined to look at available data that would have shed a glaring light on the absence of a factual basis for key representations by Lava on which he was relying, (6) and inferred the accuracy of Lava's own revenue-loss guesses based on the fact that, if charted, they would reflect an S-shaped curve.

If we look to the pertinent *Daubert* factors, this approach is indefensible. First, on its face, Clemons's method is designed to avoid confronting self-interested theory with measurable facts. That the required exercise is unavoidably hypothetical does not permit a purported expert witness to use his credentials to legitimize what amounts to a client's wishes. Clemons began with the client's guesses and ultimately relied on them because his "sense" was that they were plausible, while he avoided meaningful inquiry into whether they had a basis in fact. Such an approach is plainly inconsistent with the requirement that the expert use "scientific" or "professional methods." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,* ___ F.3d ___, 2005 WL 107184, *2 (7th Cir. Jan. 20, 2005). *See id.* at *3 (rejecting use of plaintiff's internal projections to judge likely future revenues "but for" defendant's misconduct).

**\*17** As the Seventh Circuit has recently noted, a putative expert who seeks to estimate "but for" sales cannot rely on his "industry expertise" or its equivalent as a substitute for a methodology that looks to specific data and proceeds to make statistically or scientifically valid inferences from the data. *See id.* at *2-3. "Intuition won't do." *Id.* at *2. The witness must look to comparable markets, and if they differ from the market for which he is offering predictions,

he must utilize professionally accepted methods of making comparisons-even of "unique" markets-that will take into account the uniqueness of the comparators. *See, e.g., id.* at *2 (noting availability of multi-variate regression analysis as one tool for permitting such comparisons). (*See also* Levy-Sachs Trans. Aff. at Ex. X).[25]

Clemons failed to undertake any such analysis. He simply based his opinions on estimates or guesses supplied by the client. That is not adequate. *See, e.g., id.* at *3 (rejecting, as "doubly" unacceptable, reliance on party's "internal projections," "which rest on its say-so rather than a statistical analysis"). Moreover, although he might have undertaken some form of reality check on his projections-for example, by comparing the S curve derived from Hessler's data to ones for comparable products or even, less satisfactorily, by systematically comparing Hessler's estimates with Lava's prior performance and prior projections for the same period, together with documented vetting of the underlying data on which Hessler had purportedly relied-he did none of these things. (*E.g.,* Dep. Tr. 63-64, 68-69, 71-72, 108-09, 321-22, 448-49).[26]

Second, plaintiff offers no suggestion that Dr. Clemons's approach has been or can be tested for reliability as a measure of lost revenue. "An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." *Zenith Electronics Corp.,* 2005 WL 107184, at *2. Clemons's general impression about both Lava's business prospects and the plausibility of the numbers his client offered him does not permit such replication. *See, e.g., id.* at *2 ("Shapiro's method, 'expert intuition,' is neither normal among social scientists nor testable-and conclusions that are not falsifiable aren't worth much to science or the judiciary.").

Third, the particular methodology identified by Clemons as central to his analysis is not generally accepted as an appropriate means of ascertaining lost revenues. Indeed, Clemons himself conceded that the so-called S-curve analysis is normally done for the far more impressionistic purpose of estimating the likelihood of future success or failure for a proposed business venture, and that he had never used one-or apparently known of such use-for forensic purposes. (Dep. Tr. at 349-52).

**\*18** The inappropriateness of such an approach to the current lost-income analysis was underscored by a recent ruling of the Tenth Circuit adopting a trial court's rejection of the use of an S-curve to determine lost profits. That ruling was based in part on the conclusion that "S curves are not appropriate for a young company ... that claims to have a vast untapped market in need of its unique product." *Lifewise Master Funding v. Telebank,* 374 F.3d 917, 929 (10th Cir.2004), *aff'g Lifewise Master Funding LLC v. Telebank,* Case No. 2:00CV0495B, slip op. (D.Utah March 5, 2003) (Deft's Supp. Memorandum at Ex. B).

The accuracy of this observation is supported by plaintiff's own effort to demonstrate that S-curve analysis has been the subject of peer review and publication, or its equivalent. Although plaintiff proffers a weighty compendium of publications that refer to the use of an S curve (*see* Meyers Aff. at Exs. 1-12), none reflects its use for income-loss measurement for a recently-created product or service that is likely to be tapped by a narrow market, as distinguished from mass-market consumer products the prospective use of which over a period of years is being assessed. (*See, e.g., id.* at ¶¶ 17, 35, 40-41, 43, 46, 48 & Exs. 1-2). Furthermore, these estimates appear to concern only types of products–whether cell phones or faxes or VCRs–and not specific competing brands. (*See, e.g., id.* at Ex. 1; Dep. Tr. at 125, 291-94).[27]

Other than for such uses, plaintiff offers no evidence that Clemons's general approach has been accepted in the relevant profession. As noted, the record is bare of any indication that S-curve analysis has been used to estimate actual revenue losses, a point that Clemons himself has virtually conceded. (Dep. Tr. at 350-51). In fact, the pertinent literature recognizes that S-curve analysis is utilized to assist decision-making regarding product development and marketing strategies, and rests on the evaluation of product performance over many years. (*See, e.g.,* Meyers Aff. at Exs. 1-2; *see also* Levy-Sachs Trans. Aff. at Ex. O). The commentators have also repeatedly noted the ease with which such analysis can be manipulated to yield almost any result sought by the analyst and its strong tendency to produce wildly unrealistic projections of extraordinary sales growth. (*See, e.g., id.* at Ex. W. *Accord, Lifewise Master Funding LLC,* Case No. 2:00CV0495B, slip op. at 41-42).

Finally, Clemons conceded that he has not attempted to measure or estimate any error rate for this method. (Dep. Tr. at 303-04). Although he noted that he had done a sensitivity analysis after the preparation of his two reports,

he conceded that if the data he used in deriving his loss estimates were systematically biased, the sensitivity analysis would not detect such error. (Dep. Tr. at 361). Moreover, he conceded the obvious point that if the factual representations by Lava on which he had relied were incorrect, so too would be his estimates. (Dep. Tr. at 381-82). Furthermore, as we have noted, Clemons chose not to attempt any comparisons with the real-world experience of other technology-based products–either in the securities industry or elsewhere–in assessing the plausibility of the S-shaped curve designed by Hessler that he has blessed in his deposition testimony.

**\*19** With regard to Dr. Clemons's estimate of the loss caused by a delayed payment by Hartford, as we noted, he simply relied on Mr. Rafieyan's "sense" that, with more money in December 2001, he could have speeded up the process of expanding his client base and that this would have "shifted his revenue curve by three months." (Dep. Tr. at 294-95). This approach by Clemons betrays the same deficiencies as his method for estimating the lost revenues attributable to September 11. Reliance on–and indeed the rubber-stamping of–the client's vague, self-interested and untested beliefs does not constitute a reliable method of estimation, does not reflect any meaningful expertise on the part of the estimator, and most assuredly does not assist the trier of fact.

In sum, as a generic matter, plaintiff has failed to show that Clemons's approach to loss estimation meets the basic reliability criteria of Rule 702, as elaborated by *Daubert* and its progeny.[28] For reasons that we will further note, his analysis in this case would not pass muster in any event because it does not square with the facts of record.

**E. *Failure of Key Factual Premises***

As we have noted, Dr. Clemons constructed a model that was premised on a variety of assumed facts, and failed to verify the validity of those assumptions. Upon examination, a number of crucial factual premises for his model are plainly unfounded.

The measurement of lost revenues that Clemons offered rested on the belief that Lava had obtained approximately 73 percent of the OTC market for its Color Book product by about March 2003. According to Clemons, that actual performance legitimized the estimate of George Hessler that, but for the September 11 attack, Lava would have attained 73 percent of the potential market by October 31, 2002. In fact, however, it appears that by the Spring of 2003 Lava

had managed to acquire only a 24-percent share of the OTC market. (*See* Levy-Sachs Trans. Aff. at Ex. S).

On a related point, Clemons projected an extraordinarily steep one-year revenue growth, and he based that projection on the assumptions that the Lava product was a "must have" item and that Lava faced no real competition in the early part of the relevant period. In fact, however, Lava itself recognized before that time that there were potential competitors in the market, and a recent report on the industry has noted that as of 2004 only 40 percent of the industry was using order-management systems. (*Id.* at Exs. N, P, Q (Rafieyan Dep. at 12-23), R).

In the same vein, the analysis proffered by Clemons assumed that Lava would enroll 160 trading desks in the 16 firms that were the subject of his assessment. (Ackerman Trans. Aff., Ex. 7). By contrast, as of March 2003 (the time at which Clemons hypothesized that Lava had achieved the growth that it would otherwise have attained by October 31, 2002), Lava was connected to only 40 desks. (Levy-Sachs Trans. Aff., Ex. T. *See also* Affidavit of Stephen E. Goldman, Esq., sworn to Dec. 16, 2004, Ex. 17 (filed in support of Hartford's Motion for Sanctions)).

 **\*20**  In plaintiff's extensive opposition to the current motion, it discloses that Clemons's model was premised on the assumption that Lava would have new product offerings during the relevant period. (Meyers Aff. at ¶ 33). Clemons, however, conceded that delays in product release did not adversely affect Lava's revenues during the pertinent period. (Dep. Tr. at 447-48; *see also id.* at 63, 57, 182).

Still another factual error is conceded by Clemons, this time with regard to the effect of the revenue caps that Lava granted to a number of clients. Clemons now admits that he understated the effect of these caps, which he now describes as totaling 8.75 million dollars. (Clemons Aff. at ¶ 6.4.7; Meyers Aff. at ¶ 25). Moreover, although Clemons describes the caps as limited to specific firm employees at specific desks (Clemons Aff. at ¶ 6.4.3), that assertion is contradicted by Lava's own spreadsheets, which describe several of the caps as firm-wide and refer to another as applicable to all firm employees. (Ackerman Trans. Aff. at Ex. 7; Levy-Sachs Trans. Aff. at Ex. V). These errors, although limited to one adjustment in Clemons's analysis, are emblematic of the divorce between what Clemons did and the factual basis for any such analysis.

As for Clemons's estimate of delay damages, he assumed that Hartford should have paid Lava two million dollars in December 2001. Apart from the other problems with Clemons's three-month revenue shift-which also does not embody any accepted methodology or factual basis-his central assumption is plainly false. Lava did not file even a preliminary business interruption claim until January 2002, and it was in the amount of only $933,000.00. (Levy-Sachs Trans. Aff. at ¶ 21 & Ex. EE).

Finally, a very recent-and untimely-production of documents by plaintiff[29] has yielded additional information undercutting several key factual premises of Clemons's analysis. As noted, Clemons adopted the estimates of Hessler about revenue generation based on the assumption that, absent September 11, Lava would have achieved by October 31, 2002 the competitive position he believed that it had accomplished six months later. As he put it, Lava's growth was delayed by six to eight months because-post-September 11-its development people were not working on new products for four to six months since they were tied up with re-installations, its sales people were also occupied with recovery efforts, Lava was not fully connected for an extended period of time, and the company was "starved" for cash or financially "crushed", which prevented it from hiring more people to restore current customers, thus freeing more experienced staffers to go after new business. (*E.g.,* Dep. Tr. at 200, 308-10, 339, 395).

In striking contrast, the new batch of e-mails reflects that Lava was not "financially crippled" or operationally devastated during the six months following September 11, as Clemons suggested. The e-mails show that within a few days after September 11, Lava had located available alternative premises; that it had moved into office and data center space by early to mid-October; that by the week of October 9, 2001 it had resumed trading; that by mid-October it was rapidly reconnecting its clients; that in November 2001 it traded more than one billion shares and-according to its Chief Executive Officer, Richard Korhammer-was trading by mid-November at a level twenty-five percent higher than before September 11;[30] that it was undertaking renewed product development and marketing by October 2001; and that it was hiring new people, including sales personnel, by mid-October. (*See* Goldman Dec. 16, 2004 Aff. at Exs. 13-21; Tobin Aff. at Exs. 2, 4, 5, 6, 7, 8, 11, 12, 13, 14, 16, 22, 23).[31] The same set of belatedly produced documents reflect that by January 2002 Lava had more than doubled its share volume from the record level of November 2001, and that its revenues were

Case: 13-3597    Document: 39    Filed: 10/15/2013    Page: 58

climbing in tandem with the volume of trading. (*See* Tobin Aff., Ex. 22-LBM0000000098; *id.,* Ex. 7-LKR106050). In short, these documents (1) reflect that plaintiff was neither technologically nor financially "crippled" for six or eight months and (2) demonstrate still further a profound lack of fit between Clemons's proffered opinions and the facts of this case. [32]

 **\*21** In sum, apart from the inherent lack of reliability in Clemons's methodology for estimating "but for" revenues, his analysis is premised on a number of crucial factual assumptions that are dramatically belied by the record before us. Necessarily, then, his ultimate opinions plainly lack even arguable reliability and would not meaningfully assist the trier of fact. Indeed, quite to the contrary, they seem geared to promote jury confusion by tying an impressive set of academic and business credentials to a series of very large loss numbers that have not been shown to have any meaningful, much less rigorously analyzed, basis.

### F. *Proposed Relief*

As we have noted, Dr. Clemons's report in both its versions and as supplemented by counsel's October 5 letter and accompanying spreadsheets, were plainly not compliant with the requirements of Rule 26(a)(2)(B). Their patent inadequacy deprived defendant of the ability, guaranteed by the pertinent rule, to prepare for trial without engaging in a prolonged and searching follow-up series of deposition sessions. Moreover, the failings of plaintiff's disclosures in this respect are only accentuated by its submissions on the current motion, which include lengthy affidavits by Clemons and by Dr. Meyers. Those affidavits seek to introduce substantial additional materials and to proffer new analyses and explanations in support of Clemons's numbers. In short, all of the prior inadequate submissions were in the nature of preliminary drafts, with Clemons's theories subject to repeated alteration as they were sequentially called into question. *See, e.g., Salgado,* 150 F.3d at 741-42.

This "dance of the seven veils" approach to expert discovery is the precise target of Rule 26(a)(2)(B). Under all of the circumstances, even if Clemons had ultimately arrived at a defensible theory for estimating lost revenues, the appropriate

sanction in this case would be preclusion. *See, e.g., Salgado,* 150 F.3d at 740-43 & n. 6.

In any event, as we have noted, the methodology utilized by Clemons does not meet minimum standards for the admissibility of his opinions about lost revenues under the *Daubert* precedent. His approach is untested, unproven, not generally accepted as appropriate for the type of use to which he puts it, premised on false assumptions, and demonstrably unreliable. Accordingly, he should be precluded from testifying to those opinions.

From this conclusion, it follows as well that Mr. O'Connor should be precluded from testifying to damage figures. Plaintiff concedes, as it must, that O'Connor's testimony is derivative of Clemons's, in that he relies on Clemons's revenue-loss opinions to determine recoverable damages. (*See* Ackerman Trans. Aff. at Ex. 6 (O'Connor's expert report). If Clemons's opinions are deemed not to be admissible, it follows that O'Connor's conclusions lack an evidentiary predicate and hence also cannot be received in evidence.

### CONCLUSION

 **\*22** For the reasons noted, we recommend that defendant's motions for sanctions under Rule 37 and for preclusion under Fed.R.Evid. 702 be granted.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable P. Kevin Castel, Room 2260, 500 Pearl Street, New York, New York, and to the chambers of the undersigned, Room 1670, 500 Peal Street, New York, New York. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Footnotes

1    Hartford urges the Court to review the Magistrate's R & R under a "clearly erroneous" standard of review, rather than *de novo.* Rule 72, Fed.R.Civ.P. provides that the district judge shall modify or set aside a non-dispositive order of a magistrate judge "found to be clearly

erroneous or contrary to law," Rule 72(a), while it must "make a de novo determination" of a recommendation of a ruling "dispositive of a claim or defense of a party," Rule 72(b). Although Courts have declined to review a Magistrate Judge's ruling excluding evidence *de novo* because such rulings are not formally case-dispositive (even if designated a "Report and Recommendation"), I need not resolve whether the R & R before me should be classified as dispositive or non-dispositive, because I find that it should be upheld under either standard.

2    In its Reply Memorandum in further support of its Objections, Lava argues that an expert proffered for the purposes of establishing the amount of a claim under a business interruption policy need not meet the standards for expert testimony set out by the Supreme Court in *Daubert* and progeny. Pls. Reply Mem. at 4-6. While it may be true, as Lava suggests, that expert testimony may not always be necessary to prove a business interruption claim, it does not follow that when a plaintiff chooses to use such an expert, that expert need not satisfy *Daubert*. Lava cites no law to the contrary.

3    One article provided to the Court does suggest that the model can be adopted for estimating future sales in a situation where the selling firm generates "periodic" profit from ongoing services or user charges (Exh. 11 to the Myers Affidavit), such as internet access or cell phone service.

4    Lava does not appear to object to that portion of the R & R excluding O'Connor's testimony as derivative of the Clemons report.

1    Defendant took that deposition rather than await a ruling on its challenge to the reports, because it was required to provide its own experts' reports by November 1, 2004, and it was facing an expedited schedule to complete all remaining discovery and file both dispositive and *in limine* motions. (*See* Nov. 1, 2004 Levy-Sachs letter to the Court at 8).

2    Defendant has separately moved to impose summary sanctions on Lava for other discovery derelictions, most notably its asserted failure to provide timely and complete production of key documents, especially large quantities of e-mails. (*See* Hartford's Memorandum for Issuance of Sanctions Based Upon Egregious Discovery Misconduct). Lava has very belatedly produced documents that add further grounds for rejecting the admission of Dr. Clemons's testimony (*see id.* at 17-24), since those documents-which were not available to defendant when it was deposing Dr. Clemons-appear to refute a number of key factual assumptions on which his opinions are grounded. (*See* pp. 47-49, *infra* ).

3    Hartford's business-interruption payments totaled nearly two million dollars. (*See* Supplemental Affidavit of Stephen E. Goldman, Esq., sworn to Dec. 21, 2004, at ¶ 7 (filed in support of Hartford's Motion for Sanctions)).

4    Under the terms of the policy, the so-called period of restoration, during which Lava might be entitled to coverage for losses, was capped at twelve months. (*See* Compl., Ex. A at LAV0000000028-¶ k).

5    According to the chart annexed to Clemons's report, Lava's actual revenue for that period was $30,042,951. (*Id.*).

6    Plaintiff insists that in agreeing to a supplementation, it is not conceding that the original report was deficient. (Oct. 14, 2004 letter to the Court from Finley Harkham, Esq., at 1). Whether it so conceded is inconsequential for present purposes.

7    Since the premise for the consequential loss was the asserted delay in Hartford paying $2 million to Lava, the posited loss reflects an assumption that such a payment would have yielded a gross gain of 250 percent. The report does not explain how Lava could have achieved such a remarkable result.

8    A careful reading of the second report discloses that, in estimating revenue loss attributable to delayed payment by Hartford, Dr. Clemons shifted Lava's actual revenue figures by three months instead of two, as in the prior report-thus increasing the loss figure-and he eliminated any claimed loss for December 2001, presumably because, under his scenario, a timely payment by Hartford would have had no impact until January 2002. (*See* Clemons Dep. Tr. ("Dep.Tr.") at 392-93, 403).

9    The breadth of such progress may be viewed as equivalent to the extent of the business-that is share volume-that Lava would have acquired at any given time. Although a particular desk at a trading firm might sign up with Lava, that does not mean that all desks within the firm that could use a particular product or service would do so (Dep. Tr. at 77), and the extent of such sign-ups and utilization would presumably impact revenues to Lava.

10    When quizzed at his deposition about the basis for his assertion that the Color Book was a "must have" item, Clemons referred vaguely to people at Lehman and "Citi", to whom Lava had referred him, and, he cited a friend who worked at a New Jersey office of Merrill Lynch, and whose identity Clemons declined to disclose. (Dep. Tr. at 123-24, 125-26).

11    According to Dr. Clemons, Hessler reported-and he assumed-that as of mid-September 2001 Lava had acquired 7.9 percent of the relevant potential OTC market. (Dep. Tr. at 108-10, 145).

12    In fact, as defendant properly notes, Hessler's projections, which Clemons adopted, reflect virtually a straight line, at least through early 2002. (*See* Deft's Dec. 28, 2004 Reply Memorandum at Ex. C; Goldman Oct. 6, 2004 letter to the Court, Ex. 2, Report at p. 14, Table 1).

13    In fairness, we note that Dr. Clemons was assisted by an economist and an accountant. On the current record, however, their actual role is not described in any detail, and what specific analyses they performed is left largely to the imagination and certainly not documented. (*See* unsworn Affidavit of Eric K. Clemons, dated Dec. 8, 2004, at ¶¶ 4.5.1-4.5.3, 7.1.1.-7.9; Affidavit of Dr. Glenn D. Meyers, sworn to Dec. 8, 2004, at ¶¶ 4, 5).

14   He reports that he is "qualified to express expert opinion on matters of dynamic competitive strategy in the area of high technology competition in a financial services company." (Clemons Aff. at ¶ 3.4.6).

15   Indeed, it was only just before the first deposition session that Clemons asked Hessler to prepare a written reconstruction ("crib notes") of comments that Hessler had made to him months before about the size of the available market. (Dep. Tr. at 271; Transmittal Affidavit of Wystan M. Ackerman, Esq., sworn to Nov. 15, 2004, at Ex. 11).

16   Clemons has never explained why these projections were unduly cautious.

17   *Compare* Goldman Oct. 6, 2004 letter to the Court, Ex. 2, Report at p. 14 (projecting $97.4 million in revenue for September 2001 through October 2002), *with* Ackerman Trans. Aff. at Ex. 8 (Lava's Business Plan & Investment Offering dated July 16, 2001 (projecting revenue of $32.6 million for 2002)).

18   Clemons's projected revenue numbers for September through December 2001 are: $1,124,450.00 (September); $2,274,000.00 (October); $3,391,637.00 (November); and $4,814,123.00 (December). By comparison, according to belatedly produced Lava documents, Lava's own August 2001 gross-revenue projections for those months were only: $488,000.00 (September); $703,000.00 (October); $827,000.00 (November); and $924,000.00 (December). (*See* Affidavit of Rhonda J. Tobin, Esq., sworn to Jan. 3, 2005, Ex. 19-LKR011164, LKR011170) (filed in support of Hartford's Motion for Sanctions).

19   As of September 2001, Lava had signed up only seven of the sixteen firms that Clemons posited as the plaintiff's largest customers for the pertinent period. (*See* Ackerman Trans. Aff. at Ex. 10).

20   As explained by Clemons:

Q: Okay. Did you verify when-the numbers, meaning the potential revenues you used came from Mr. Hessler, is that correct?
A: Let me try that. The numbers that are keyed in for the size of the available desks are, in fact, from Mr. Hessler. But as we discussed the last time, I would take a look at a number and I would say why is that low and he would say it was a cap. And I would say why is that cap high and he would say because they bought a firm that specializes in that area. And I would say, well, how do we know and he'd say because we have invoices that represent full trading. How do you know. Well, they are the same size as Bear and we have invoices for Bear. So the over-the-counter desk at Bank of America ["B of A"] would be roughly the same at saturation as Bear. And I would say B of A, why are they that big and he'd say well, B of A purchased. And I'd say, right, I forgot that.
So in other words, there was a lot of debate that went on firm by firm and even desk by desk before I accepted the numbers.
Q: And none of that discussion or that debate was memorialized?
A. That's correct. And my sense was the best source for that would be George [Hessler].... But the data here after debate actually seems pretty comfortable to me. (Dep. Tr. at 262-64). As noted, the only documentation even of these discussions took the form of "crib notes" created by Hessler at Clemons's request several months later, in October 2004, to use at Clemons's forthcoming deposition. *See* p. 28, n. 15, *supra.*

21   Clemons did not suggest the facts upon which he based his contention that the markets were "crippled" for two months or that Lava was "financially crippled" for four more months, precluding product development and hiring of sales staff. As we will see, the record reflects quite the opposite. *See* pp. 47-49, *infra.*

22   Clemons was quite specific as to his methodology: "The calculations were really appallingly simple. We know what the actual revenue was in January '02, which is shown here as $1,681,762, we know what the actual revenue was for April which was $2,284,301. I took the April revenue and put it in January. I took the May revenue and put it in February. And I took the June revenue-I just moved each of the revenues three months over in time." (Dep. Tr. at 390).

23   Clemons also conceded that, in the course of this discussion, he did not ask Rafieyan "whether he had anybody he wanted to hire." (Dep. Tr. at 395).

24   "So my job was not to explain the discrepancy between 97 and 33. That's in the catastrophic events of 9/11. My job is to come up with a number and find out if the number is, in fact, achieved within a reasonable period of time later. In other words, but for the delay, could they have achieved those volumes. And they could have." (Dep. Tr. at 453).

25   As Judge Easterbrook noted in *Zenith,* if there are reasons why such a comparison is impossible, the party proffering the expert must prove such impossibility, and the *ipse dixit* assertion of the expert that the market in question is "unique" does not constitute such proof. *See id.* at *2.

26   Even Clemons acknowledged the need for a "reality check", but described his check as consisting of conversations with Hessler. (Dep. Tr. at 453). A party's "say-so rather than a statistical analysis" is not a reality check and is not useful science. *See Zenith,* 2005 WL 107184 at *3.

27   The difficulty with Clemons's approach is highlighted by his explanation for paying no attention, for example, to the details of whether Lava's sixteen principal actual or potential customers as of September 2001 were in a position, or likely, to give Lava significantly more business in the coming months. While conceding that he had ignored these considerations, he excused that failing by asserting that he was using an "actuarial" approach, which does not require knowledge-for example-of an individual's health and other circumstances in order to measure life expectancy. (Dep. Tr. at 280-81, 358-59, 430-31). Such actuarial tables rest, however,

on the experience of millions of people over many years. That is far different from predicting, with any reliability, the amount of revenue likely to be generated over a period of months from a relative handful of firms, some much larger than others, and some with far more vibrant prospects as a customer of Lava than others.

28    In moving for relief, defendant also argues that Dr. Clemons's assessment does not square with the terms of the governing insurance policy. (*See* Deft's Supplemental Memorandum at 28-30; Deft's Reply Memorandum at 35-42). We do not rely on this argument since (1) Dr. Clemons is simply proffering an opinion as to total lost revenues, (2) another witness, apparently Mr. O'Connor, may be able to adjust those numbers to fit the criteria of the policy, and (3) the proper interpretation of the policy is apparently in dispute and will presumably be resolved either by the court on motion or by the trier of fact.

29    Plaintiff produced thousands of pages of e-mails on December 10 and 13, 2004. (*See* Deft's Dec. 17, 2004 Memorandum for Issuance of Sanctions at pp. 1, 13 & n. 3; Goldman Dec. 16, 2004 Aff. at ¶¶ 16-23 & Exs. 12, 14-21).

30    "Our volume is about 25% higher than it was before the disaster now. We're back up and running." (Tobin Aff., Ex. 5 at LKR107748).

31    Among the more pertinent of the recently produced documents, all drawn from the Tobin Affidavit, are the following: Ex. 2-LKR103890, 103765, 103760, 107978, 107986; Ex. 4-LSM000000001-4; Ex. 5-LKR103454, LKR107748; Ex. 6-LKR107883; Ex. 7-LKR107050; Ex. 8-LKR108305-6; Ex. 11-LKR0000000501; Ex. 12-LKR0000001115; Ex. 14-LKR107450, 103293; Ex. 16-LKR107326; Ex. 22-LBM0000000021, LBM0000000087, LBM0000000098, LBM0000000139; Ex. 23-LKR101920-2).

32    We note as well that as late as July 2002 Lava reported to its Board of Directors that its then-current expectation was that its insurance claim for lost income and related expenses-which was apparently still being revised-would end up in the range of three to five million dollars. (*See id.,* Ex. 22-LBM0000000139).

---

**End of Document**                                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.